# United States Court of Appeals
## For the First Circuit

No. 12-2121

SHOWTIME ENTERTAINMENT, LLC,

Plaintiff, Appellant,

v.

TOWN OF MENDON, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Torruella, Howard, and Kayatta,
Circuit Judges.

Thomas Lesser, with whom Michael Aleo and Lesser, Newman & Nasser, LLP were on brief, for appellant.
Brandon H. Moss, with whom Robert S. Mangiaratti and Murphy, Hesse, Toomey & Lehane, LLP were on brief, for appellees.

October 8, 2014

**TORRUELLA, Circuit Judge.** This case directs our attention to the extent by which a town may abridge expressive activity, protected under the First Amendment and the Massachusetts Constitution, as a valid exercise of its zoning power. The Town of Mendon, Massachusetts ("Mendon") has set forth a veritable maze of zoning restrictions that are singularly applicable to adult-entertainment businesses. Owning one of the few parcels of land within Mendon city limits still available for the conduct of such business, Showtime Entertainment, LLC ("Showtime"), attempted to navigate these many restrictions. The result: Showtime received an adult-entertainment license but found its preferred building plans circumscribed in both size and height, its proposed operating hours curtailed, and its ability to receive a license to sell alcohol foreclosed.

Before the district court, Mendon cast these restrictions as appropriate measures by which it sought to control only the secondary effects uniquely related to the expressive activity -- altered town aesthetics, heavy traffic flow, and increased crime. Showtime retorted that the restrictions infringed on its ability to present live nude dancing to a degree that violated the Federal Constitution and the Massachusetts Declaration of Rights.

Viewing Showtime's suit as a facial challenge to the bylaws, the district court entered summary judgment in favor of Mendon, concluding that the restrictions in question were

sufficiently tailored towards controlling the secondary effects of speech. After careful consideration, we disagree that the bylaws regulating the size, height, and hours of operation support a substantial, content-neutral governmental interest. We find that these bylaws -- which have no effect on other businesses of like size, height, or operating hours -- unconstitutionally infringe on Showtime's right to engage in a protected expressive activity. We also find that the application of Article 16 of the Massachusetts constitution to the Mendon bylaw banning the sale and consumption of alcohol is a close issue of constitutional law and difficult for us to predict. Therefore, we certify questions related to this claim to the Massachusetts Supreme Judicial Court.

## I. Background

Because this appeal stems from a grant of summary judgment, we begin by setting forth the facts in the light most favorable to Showtime, the losing party below. Prescott v. Higgins, 538 F.3d 32, 38 (1st Cir. 2008).

### A. Mendon creates the Adult-Entertainment Overlay District

In May of 2008, at its annual town meeting, Mendon amended its zoning bylaws. Of relevance to this litigation was the addition of section 5.01, which created an Adult-Entertainment Overlay District, limiting the location of any adult-entertainment business -- a category that includes adult bookstores, video stores, paraphernalia shops, and businesses showing live nude

dancing -- to four specific parcels of land within city limits. These contiguous parcels are located at 41, 43, 47, and 49 Milford Street, and they all border a state highway, Route 16.  The text of section 5.01 included a preamble setting forth its purpose:

> The purpose of this Adult Entertainment Overlay District section of the Town of Mendon Zoning Bylaws is to address and mitigate the secondary effects of adult entertainment establishments. . . .  These effects include increased crime, and adverse impacts on public health, the business climate, the property values of residential and commercial property and the quality of life.
> The provisions of this section have neither the purpose nor intent of imposing a limitation on the content of any communicative matter or materials, including sexually oriented matter or materials.  Similarly, it is not the purpose or intent of this Section (Overlay District) to restrict or deny access to adult entertainment establishments or to sexually oriented matter or materials that is protected by the Constitutions of the United States and the Commonwealth of Massachusetts . . . .

Town of Mendon Zoning By-Laws, § 5.01(b).[1]

Adult-entertainment businesses seeking to operate in Mendon must also abide by licensing requirements defined in state law.  See Mass. Gen. Laws ch. 140, § 183A (requiring a license to operate an adult-entertainment business in the Commonwealth of Massachusetts); id. § 1 (stating that a town's Board of Selectmen

---

[1]  The constitutionality of establishing the Adult-Entertainment Overlay District is not disputed by Showtime.  Similar zoning restrictions have previously been upheld under intermediate scrutiny.  See, e.g., D.H.L. Assocs., Inc. v. O'Gorman, 199 F.3d 50, 53, 61 (1st Cir. 1999).

will serve as its licensing authority).  On June 2, 2008, acting pursuant to their authority as the town's licensing board, The Mendon Board of Selectmen adopted a set of regulations regarding the eligibility standards for adult-entertainment licenses.  These regulations, spanning eighteen pages, require that all adult-entertainment businesses ensure adequate lighting, signage, and noise reduction; hire security personnel; and prohibit touching or mingling between patrons and employees clothed in "less than opaque attire."  See Mendon Board of Selectmen, Town of Mendon Regulations Governing Adult-Entertainment Establishments Pursuant to M.G.L. Ch. 140 Sec. 183A (2008) (the "Adult-Entertainment Regulations"). None of those regulations are at issue in this case, and it is uncontested that Showtime is responsible for ensuring full compliance with these mandates in its operation of an adult-entertainment business.

**B. Showtime applies for a license; Mendon responds**

On June 10, 2008, soon after the passage of these regulations, Showtime applied for a license to operate an adult-entertainment business (presenting live nude dancing) on a parcel of land within the Overlay District.  Showtime's proposed building plan included an 8,935-square-foot "Adirondack style" structure with space to accommodate 244 patrons and 25 employees, to be accompanied by an 82-space parking lot.

At a September 15, 2008 town meeting, several residents spoke out against Showtime's pending proposal, citing their fear that the facility would exacerbate traffic concerns along Route 16. Also in early September 2008, Mendon citizens petitioned the Board of Selectmen to enact additional bylaws (1) restricting the maximum size and height allowances for buildings operating adult-entertainment businesses; (2) limiting the operating hours of such businesses; and (3) banning the sale or consumption of alcohol on their premises. The stated purposes for these additional bylaws, respectively, were to (1) protect Mendon's "historically rural atmosphere"; (2) support traffic safety; and (3) reduce crime associated with the combination of intoxication and adult entertainment.

The next month, Mendon issued decisions regarding both Showtime's license application and the citizen-proposed bylaws. First, on October 1, 2008, the Board of Selectmen denied Showtime's license request, citing concerns about the potential negative health and safety effects of increased traffic, noise pollution, and criminal activity. Then, on October 7, 2008, Mendon held a special meeting concerning the petition for additional bylaws restricting the operation of adult-entertainment businesses. At this meeting, the citizens' group Speak Out Mendon voiced their support of these proposed amendments as a means of curbing the perceived adverse effects of adult-entertainment businesses.

Mendon residents voted to approve the bylaws, enacting additional zoning restrictions requiring that all adult-entertainment businesses (1) have a facility no bigger than 2,000 square feet; (2) have a facility no taller than fourteen feet; and (3) open no earlier than 4:30 p.m. on days when school is in session. See Town of Mendon Zoning By-Laws, § 5.01(i)(i-ii),(iv). The written justifications for these restrictions were to maintain Mendon's "historically rural atmosphere," to ensure traffic safety, and "to provide an opportunity for all elementary school buses to finish student bus routes." Id. § 5.01(i)(i),(iv). No other business in Mendon, including any operating within the Adult-Entertainment Overlay District, is subject to the same zoning restrictions.

At the same time, Mendon's general bylaws were also amended, so as to forbid the granting of an alcohol sales license to any adult-entertainment business and to ban the consumption of alcohol by patrons within any adult-entertainment business. See Town of Mendon General By-Laws, ch. XXV. No other business in Mendon is subject to such a restriction on the licensing and consumption of alcohol, which applies only to "[adult-entertainment] establishments . . . located within the layout lines of the Adult Entertainment Overlay District."[2] The stated

---

[2] Adult-entertainment business means any "adult bookstore," "adult motion picture theater," "adult paraphernalia store," "adult video store," or an "establishment which displays live nudity for its

-7-

justification for this amendment was that "the presence of alcohol is documented to exacerbate secondary crime effects at sexually oriented businesses."  Id.

The Massachusetts Attorney General reviewed the proposed amendments and, on January 20, 2009, issued an opinion letter approving the zoning bylaws restricting size, height, and operating hours of adult-entertainment businesses in Mendon.  The Attorney General also approved the prohibition of the sale and consumption of alcohol within adult entertainment establishments based on the conclusion "that the validity of these sections is fairly debatable, and [] they are not clearly in conflict with any statute or constitutional provision."  See Letter from Attorney General Martha Coakley to Margaret Bonderenko, Town Clerk, January 20, 2009, at 2.  This letter cautioned, however, that the Attorney General's approval process "does not and cannot include the kind of factual inquiry a court might make in resolving an 'as applied' constitutional challenge."[3]  Id.

_____

patrons"  as defined by Mass. Gen. Laws ch. 40A, § 9A. The definition for adult businesses in Mass. Gen. Laws ch. 40A, § 9A is businesses that show films or have as a "significant portion of [their] stock" items that are "characterized by their emphasis depicting, describing, or relating to sexual conduct or sexual excitement as defined."

[3]  Another provision of the zoning bylaws, requiring that an Adult-Entertainment business operate no closer than 750 feet from any establishment licensed to sell liquor, was not approved and never took effect.

## C. Showtime reapplies for an adult-entertainment license

Following the adoption of these new bylaws, Showtime renewed its application for an adult-entertainment license, presenting revised building plans to the Board of Selectmen. This time, Showtime proposed a single-story, fourteen-foot-high, 2,000-square-foot building that would accommodate 74 patrons, be staffed by 20 employees, and feature 103 parking spots. At the public hearings regarding this proposal, Showtime stated that it would not seek a liquor license and would not open for operation prior to 4:30 p.m. Showtime also presented a traffic study performed by Greenman-Pedersen, Inc. (the "Greenman Study"), which concluded that "[p]eak-hour traffic volume increases as a result of the development [would] have negligible impacts on [traffic near the Overlay District]." Mendon residents argued against this study, suggesting that it failed to account for traffic already caused by nearby developments and finding error in the fact that it based its estimates on a hypothetical 6,800-square-foot structure, rather than the smaller, 2,000-foot structure actually proposed.

On May 3, 2010, the Mendon Board of Selectmen approved Showtime's second application in a ten-page decision letter, listing a subset of the applicable bylaws and regulations which would govern Showtime's license.[4]

---

[4] A sampling of these regulations require that Showtime: place no parking signs along Route 16; soundproof its facility; ensure that no materials or signage of a sexual nature be visible from outside

## D. The district court finds for Mendon

Displeased with the limitations on its adult-entertainment license, Showtime filed suit, claiming that the zoning bylaws restricting its operating hours and the size and height of its building were unconstitutional restrictions of expressive activity protected by the First Amendment. See U.S. Const. amend. I. It also challenged the ban on the sale and consumption of alcohol on the premises, alleging that this restriction was in violation of Article 16 of the Massachusetts Declaration of Rights. Mass. Const. art. XVI.[5] The parties filed cross-motions for summary judgment and, on August 9, 2012, the district court entered judgment in favor of Mendon on all claims related to the constitutionality of the bylaws now on appeal.[6] The

---

or appear in facility windows; monitor its parking areas nightly; and hire an off-duty police officer to patrol the premises on Thursday, Friday, and Saturday nights. See Decision re: Showtime Entertainment, LLC, Town of Mendon Board of Selectmen (May 3, 2010).

[5] Showtime also brought a claim under the Massachusetts Civil Rights Act ("MCRA"), which prohibits the interference with federally or state-protected rights by "threats, intimidation, or coercion." Mass. Gen. Laws ch. 12, § 11I-H. The district court dismissed this claim on the grounds that municipalities are immune from suit under the MCRA. On appeal, Showtime alleges that this immunity applies only to claims for damages and asserts that it can seek injunctive relief against officials in their official capacity under the MCRA for "economic coercion." Because we otherwise find for Showtime, invalidating the bylaws in question, we need not consider this claim on appeal.

[6] In the district court, Showtime also challenged a special permitting requirement applicable only to adult-entertainment businesses. The district court held that this requirement was an

district court reasoned that the restrictions served an important government interest, were sufficiently narrowly tailored, and left open alternative means of communication. Showtime now appeals, largely reasserting the arguments it made before the district court.

## II. **Discussion**

Where a district court has granted a motion for summary judgment, our review proceeds de novo. Seqrets, Inc. v. Gillman Knitwear Co., 207 F.3d 56, 61 (1st Cir. 2000). In undertaking this review, we adopt the view of the record that is most favorable to the non-moving party. LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (citations omitted). We give no heed to speculative, unsupported, or unreasonable conclusions, but favor Showtime's factual presentation insofar as it finds support in the record. Medina-Rivera v. MVM, Inc., 713 F.3d 132, 134 (1st Cir. 2013). We let a grant of summary judgment lie only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine where there exists "evidence [] such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

---

unconstitutional prior restriction on speech, granted summary judgment in favor of Showtime on that claim, and awarded Showtime attorney's fees and costs in the amount of $24,754.56. Mendon does not appeal this decision.

That the parties here filed cross-motions for summary judgment does nothing to alter or amend this standard of review, but demands only that we "determine whether either of the parties deserves judgment as a matter of law on [the] facts that are not disputed." Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996). In so doing, "the court must consider each motion separately, drawing inferences against each movant in turn." Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997).

**A. The constitutionality of the zoning bylaws**

**1. Preliminary wrangling: facial versus as-applied**

The parties first spar over the nature of Showtime's constitutional claim, disputing whether it is a facial or an as-applied challenge. Mendon argues -- and the district court agreed -- that Showtime is limited to a facial challenge, given that it has never been sanctioned for violating any town bylaw. Showtime disagrees, arguing that it is clearly subject to the bylaws, allowing us to assess the application of these bylaws as-applied. Showtime points out that its initial license application was rejected based on size and height concerns, and that its renewed license application was only accepted based on its agreement to strictly adhere to the bylaws as amended. In the alternative, it notes that, given the facts of this case, there is little practical distinction between a facial and an as-applied challenge. Circumscribed as the universe of applicability for these bylaws is

-12-

-- they reach only the four plots of land within the Adult-Entertainment Overlay District -- Showtime suggests that a facial challenge, in this context, must proceed in a near-identical fashion to an as-applied challenge.

In fact, this case highlights the sometimes nebulous nature of the distinction between facial and as-applied challenges, for Showtime's challenge does not fit neatly within our traditional concept of either type of claim. Still, we are not left without guidance in navigating this issue, as the Supreme Court has faced a similar duality in the First Amendment context. See John Doe No. 1 v. Reed, 561 U.S. 186, 194 (2010). In Reed, the Court noted that the challenge on appeal "ha[d] characteristics of both" facial and as-applied challenges. Id. It concluded, however, that "[t]he label is not what matters. The important point is that [the] claim and the relief that would follow . . . reach beyond the particular circumstances of these plaintiffs. [It] must therefore satisfy our standards for a facial challenge to the extent of that reach." Id. (citing United States v. Stevens, 559 U.S. 460, 473 (2010)).

We understand the relief sought here to be the invalidation of the zoning bylaws, not merely a change in their application to Showtime. Drawing guidance from Reed, it is clear that this is a request that "reach[es] beyond" the precise circumstances of Showtime's license application. See id. As such, Mendon must prove that the bylaws have "a plainly legitimate

-13-

sweep."  Wash. State Grange v. Wash. State Republican Party, 552

U.S. 449 (2008); see also McCullen v. Coakley, 571 F.3d 167, 174

(1st Cir. 2009) (describing the requirement that a statute "has a

plainly legitimate sweep" as a "refinement of [the Supreme Court's]

earlier statement that a party mounting a facial challenge 'must

establish that no set of circumstances exists under which the Act

would be valid.'" (quoting United States v. Salerno, 481 U.S. 739,

745 (1987))).[7]

     As Showtime notes, however, the bylaws in question apply

only to adult-entertainment businesses within Mendon's city limits,

and consequently, only within the four-parcel Adult-Entertainment

Overlay District.  The four plots lay adjacent to one another,

share a common access route, and are practically equidistant from

Mendon's residential and other commercial areas, indicating that

the effect on traffic, property values, or Mendon's cityscape

created by an adult-entertainment business located on any one of

these plots would be the same as that created by any of the other

---

[7]  A facial challenge may also succeed where even though "one or
more valid application exists, the law's reach nevertheless is so
elongated that it threatens to inhibit constitutionally protected
speech."  McGuire v. Reilly, 260 F.3d 36, 47 (1st Cir. 2001).  This
standard refers to a party's ability to challenge a restriction on
speech based on its overbreadth.  See Stevens, 559 U.S. at 473 ("In
the First Amendment context . . . this Court recognizes a 'second
type of facial challenge,' whereby a law may be invalidated as
overbroad if a substantial number of its applications are
unconstitutional, judged in relation to the statute's plainly
legitimate sweep." (quoting Wash. State Grange, 552 U.S. at 449 n.6
(2008)).

-14-

three.  As such, the manner in which the bylaws apply to Showtime is effectively identical to any of the bylaws' other potential applications.  Even limited to a facial challenge, therefore, Showtime's claim is not one in which our court must indulge in vivid imaginings, creating a large set of hypothetical applications so as to test their possible validity.  See Reed, 561 U.S. at 194 (explaining that a facial challenge must consider all possible applications of the law to "the extent of [its] reach" (emphasis added)).  Here, that reach is exceedingly small.  Therefore, although we treat this claim as a facial challenge, the practical effect of that distinction, as relevant to Showtime's claim, is strikingly minimal.

## 2. The level of scrutiny: strict or intermediate

We turn next to the task of identifying the appropriate level of scrutiny to be applied to Mendon's regulations.  In undertaking this analysis, we travel a well-worn path.  It is axiomatic that "the government cannot inhibit, suppress, or impose differential content-based burdens on speech."  McGuire v. Reilly, 260 F.3d 36, 42 (1st Cir. 2001) (citing Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 641 (1994)).  This broad protection further extends, without question, to "expressive conduct," R.A.V. v. City of St. Paul, 505 U.S. 377, 382 (1992) (citing Texas v. Johnson, 491 U.S. 397, 406 (1989)), including those expressive activities associated with adult entertainment.  To sustain such a content-

based restriction, the government must prove both a compelling state interest and that the means used to achieve that interest are the least restrictive available.  See, e.g., United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 813 (2000).  In practice, this test is exceedingly difficult, and the vast majority of such regulations are held to unconstitutionally inhibit speech.  See McGuire, 260 F.3d at 43.

In contrast, content-neutral restrictions on speech are awarded more deference, for they are understood to "burden speech only incidentally."  Id.  Because courts have recognized that such restrictions "portend less jeopardy for freedom of speech," they are assessed under a still-stringent, but less-exacting form of review.  Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 737 (1st Cir. 1995).  This intermediate level of scrutiny allows regulations justified by neutral purposes, rather than by the content of speech, to survive so long as they support a significant government interest, do not burden substantially more speech than necessary, and leave available alternative channels of communication.  Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984).

In City of Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986), the Supreme Court crystallized its approach to zoning regulations affecting adult-entertainment businesses.  There, the Court made clear that "with respect to businesses that purvey

sexually explicit materials, zoning ordinances designed to combat the undesirable secondary effects of such businesses" are rightly considered content neutral.  Id. at 49 (citing Young v. Am. Mini Theatres, Inc., 427 U.S. 50, 70-71 & n.34 (1976)).  The Court explained: "[w]e have here merely a decision by the city to treat certain movie theaters differently because they have markedly different effects upon their surroundings . . . ."  Id. (quoting Young, 427 U.S. at 82 n.6 (Powell, J., concurring)).

Where regulatory distinctions are drawn between sexually-oriented businesses and their less prurient counterparts, therefore, the regulation is content-neutral only if the differential treatment does not stem from a disapproval of the former business-type's expression.  Instead, regulations focused on secondary effects of adult entertainment, where such effects are uniquely precipitated by that type of entertainment, are considered content neutral despite their uneven application.  See Nat'l Amusements, 43 F.3d at 738.

We recognize that such analytically neat compartmentalization often becomes muddled in practice.  See, e.g., City of Renton, 475 U.S. at 47 ("At first glance, the [] ordinance . . . does not appear to fit neatly into either the 'content-based' or the 'content-neutral' category."); Nat'l Amusements, 43 F.3d at 737 ("The concept of what constitutes a content-based as opposed to a content-neutral regulation has proven protean in practice.").  In

-17-

this case, however, the distinction is ultimately immaterial, as the bylaws cannot survive even the less onerous test of intermediate scrutiny. See Clark, 468 U.S. at 293 (explaining that intermediate scrutiny requires the showing of a substantial governmental interest, achieved through means that do not burden more speech than necessary and that leave open adequate alternative channels of communication). Therefore, recognizing that the zoning bylaws' express terms set forth content-neutral purposes, we proceed in the application of intermediate scrutiny while withholding judgment as to the bylaws' true content neutrality.

### 3. The underinclusiveness of Mendon's stated interests

Mere reference to a neutral intent does not suffice to satisfy Mendon's burden to prove that its bylaws in fact further a substantial governmental interest unrelated to the content of the speech. See, e.g., United States v. O'Brien, 391 U.S. 367, 377 (1968) (requiring a regulation to "further[] an important or substantial governmental interest . . . unrelated to the suppression of free expression); Nat'l Amusements, 43 F.3d at 738 ("[E]ven when a municipality passes an ordinance aimed solely at the secondary effects of protected speech . . . the ordinance may nevertheless be deemed content-based if the municipality differentiates between speakers for reasons unrelated to the legitimate interests that prompted the regulation." (emphasis

omitted) (citing City of Cincinnati v. Discovery Network, Inc., 507 U.S. at 429-31)).

Indeed, where such secondary effects flow in equal measure from other businesses, which nonetheless are left untouched by the regulation in question, it stands to reason that such underinclusiveness raises questions as to whether the proffered interest is truly forwarded by the regulation, or is in fact substantial enough to warrant such regulation. See Erznoznik v. City of Jacksonville, 422 U.S. 205, 215 (1975) ("This court frequently has upheld underinclusive classifications on the sound theory that a legislature may deal with one part of a problem without addressing all of it. This presumption of statutory validity, however, has less force when a classification turns on the subject matter of expression."); see also Nat'l Amusements, 43 F.3d at 738. In other words, we will not blindly accept regulations that purport to address secondary effects where there is "no justification . . . for distinguishing" between the effects caused by adult-entertainment businesses and the effects caused by any other business. Erznoznik, 422 U.S. at 215 (failing to find any support for treating traffic concerns caused by adult movie theaters differently than traffic concerns caused by any other drive-in theater).

We pause to make clear, as the district court recognized, that "the First Amendment imposes not an 'underinclusiveness'

-19-

limitation but a 'content discrimination' limitation upon a State's prohibition of proscribable speech."  R.A.V., 505 U.S. at 387. Nonetheless, we rightly pay attention to underinclusiveness where it reveals significant doubts that the government indeed has a substantial interest that is furthered by its proffered purpose. Florida Star v. B.J.F., 491 U.S. 524, 540 (1989) ("[F]acial underinclusiveness . . . raises serious doubts about whether Florida is serving the interests specified . . . ."); FCC v. League of Women Voters of Cal., 468 U.S. 364, 396 (1984) ("[P]atent . . . underinclusiveness . . . 'undermines the likelihood of a genuine [governmental] interest.'" (quoting First Nat'l Bank of Bos. v. Belloti, 435 U.S. 765, 793 (1978)); Carey v. Brown, 447 U.S. 455, 465 (1980) ("The apparent . . . underinclusiveness of the statute's restriction would seem largely to undermine appellant's claim that the prohibition . . . can be justified by reference to the State's interest . . . ."); Erznoznik, 422 U.S. at 215; Auburn Police Union v. Carpenter, 8 F.3d 886, 897 n.15 (1st Cir. 1993) ("A statute's underinclusiveness . . . indicates that the government is not, in fact, serving the proffered compelling interest.").

The amendments to the zoning bylaws expressly set forth two purposes: (1) maintaining the rural aesthetics of Mendon as a small town; and (2) avoiding traffic congestion, particularly on days when school is in session.  After careful consideration, we find both stated purposes to be patently underinclusive, and thus,

insufficient to support Mendon's claim that it has regulated adult-entertainment businesses only out of a substantial interest in curbing the secondary effects of such businesses.

### i. Mendon's rural aesthetics

The October 7, 2008, amendments to Mendon's bylaws stated that size and height restrictions were intended to protect Mendon's rural, small-town aesthetic. Showtime suggests that this claim is clearly pretextual, given that the bylaws apply only within the Adult-Entertainment Overlay District, a heavily commercialized zone. In fact, it is uncontested that the character of the Adult-Entertainment Overlay District is far from rural in nature. It currently houses multiple large or multi-story commercial structures, including a 6,900-square-foot self-storage facility, a drive-in movie theater with an estimated capacity of 700 vehicles, and a 10,152-square-foot nightclub. At the time Showtime applied for an adult-entertainment license, the lot it owned was occupied by a 2,595-square-foot, "1.9 story" landscaping supply store. Even after the bylaws' passage, none of these businesses are subject to size or height restrictions.

It is thus unclear, and Mendon does not clarify, what particular negative effect the size and height of an adult-entertainment business would have on rural aesthetics that is not shared by all other large, commercial structures (including those already operating in the Adult-Entertainment Overlay District).

-21-

This shortcoming was made particularly clear during the following

exchange at oral argument:

> THE COURT: There's a warehouse in that same
> block, isn't there?
> MENDON: On the Showtime lot there's a
> landscaping supply business. There is a self-
> storage facility in the zone as well.
> THE COURT: Yes, and how big is that?
> MENDON: It is larger than 2,000 square feet.
> I think it's six or seven [thousand square
> feet.]
> . . . .
> THE COURT: Does the warehouse impact what the
> town is trying to achieve?
> MENDON: The warehouse does not.
> . . . .
> THE COURT: It's not the size of the building,
> it's what may be perceived inside the
> building?
> MENDON: It's, it's a combination of factors, I
> think it is the size of the building, but it's
> also what's in the building . . . .

This exchange concisely illustrates the flaw in Mendon's reliance

on aesthetics: a large adult-entertainment business has no

secondary effect distinct from a large building of another sort, at

least not without reference to what goes on "in the building." Cf.

Discovery Network, 507 U.S. at 425 ("The city has asserted an

interest in esthetics, but respondent publisher's newsracks are no

greater an eyesore than the newsracks permitted to remain on [city]

sidewalks."). If size does matter, but matters only in the context

of what type of business a building houses, this belies any notion

that Mendon's size and height requirements are "justified without

reference to the content of the regulated speech." Ward v. Rock

Against Racism, 491 U.S. 781, 791 (1989) (quoting Clark, 468 U.S.

-22-

at 293).  Mendon thus appears to have differentiated between speakers for reasons "unrelated to the legitimate interests that prompted the regulation," a fact that flies in the face of Mendon's claim that the bylaws in fact further a substantial, content-neutral, interest in rural aesthetics.  Nat'l Amusements, 43 F.3d at 738 (emphasis omitted).

Given the unchallenged regulations on building appearance and advertisement, we see no cognizable difference in aesthetic impact between a large building hosting adult-entertainment activities and a large building hosting a bridge club or a bible study within the Adult-Entertainment Overlay District.[8]  Cf. Ward, 491 U.S. at 793 ("Any governmental attempt to serve purely esthetic goals by imposing subjective standards . . . would raise serious First Amendment concerns.").  The effect that the size and height of any one of these buildings would have on Mendon's cityscape, "small town feel," and rural aesthetics is identical to the effect of any other.  Moreover, this is a fact which Mendon seems to acknowledge, for it offers no argument -- beyond its problematic concession at oral argument -- that adult-entertainment businesses

---

[8]  Showtime has not challenged the regulations and licensing restrictions forbidding it from placing signs or advertisements for its adult-entertainment business on the building's exterior.  It has also not challenged the portion of section 5.01 requiring that "[a]ppearance of buildings for adult entertainment shall be consistent with the appearance of buildings in similar (but not specifically 'adult') use in Mendon, not employing unusual color or building design, which would attract attention to the premises." Town of Mendon Zoning By-Laws, § 5.01(f)(vi).

-23-

have a distinct effect on purely aesthetic concerns. We therefore find that the underinclusive nature of this size and height restriction defeats Mendon's assertion that the bylaws truly serve a substantial interest in maintaining rural aesthetics. See, e.g., Auburn Police Union, 8 F.3d at 897 & n.15.

Before moving on, we note that Mendon attempts on appeal to subtly change the contours of its stated interest, arguing that "[b]light, decreased property values, and deteriorated neighborhoods" (interests that are more closely related to monetary value and quality of life than to a "rural aesthetic") may spread beyond the four-plot Adult Entertainment Overlay District. Therefore, it suggests that our review must also extend beyond the Adult Entertainment Overlay District -- a clearly commercialized area bordering a state highway, which boasts of little by way of rural aesthetic -- and take into consideration Mendon's rural nature as a whole. We refuse to do so, for the simple reason that this suggestion runs contrary to the multitude of studies Mendon itself entered into the record. These studies exhibit a common theme regarding the effect of adult-entertainment businesses on property values and quality of life in residential neighborhoods: these effects have a limited radius. The studies caution that any negative effects caused by adult-entertainment businesses on the surrounding area extend, on average, a few city blocks in

-24-

distance.[9]  Therefore, even if Mendon could recraft its stated interest in aesthetics to encompass these issues, it has presented to our court a wealth of evidence suggesting that its size and height requirements would not in fact further the avoidance of such negative effects throughout the city.  See Nat'l Amusements, 43 F.3d at 741 ("[A] governmental interest woven exclusively out of the gossamer threads of speculation and surmise cannot be termed substantial.").

### ii. Mendon's traffic concerns

Avoiding traffic congestion along Route 16 is another stated justification for the size, height, and operating hours restrictions of the amended bylaws.  Mendon asserts that it has a substantial interest in combating the neutral, secondary effect of increased traffic caused by patrons traveling to and from the Adult-Entertainment Overlay District.  Specifically, restricting the opening hours for adult-entertainment businesses to 4:30 p.m. is justified as a means of allowing all local school buses to complete their routes absent increased traffic.  Multiple studies, Mendon argues, suggest that traffic congestion is created by adult-entertainment businesses, such that a town may choose to regulate the operating hours and size of those businesses to curb the effect.  Showtime counters this argument, pointing to the fact that

---

[9]  The distances referenced in the studies range from 200 to roughly 3,000 feet.

-25-

to receive an entertainment license under Massachusetts law, a business must already prove that its operations would not cause "an unreasonable increase" in traffic levels. Mass. Gen. Laws ch. 140, § 183A. It also presents the Greenman Study as proof that any traffic effect would be, at most, negligible.

Careful scrutiny reveals that the bylaws are equally underinclusive as related to traffic concerns as they are to Mendon's rural aesthetic. We are thus convinced that Mendon, on this record, has not set forth evidence that the bylaws actually further its substantial interest in curbing traffic congestion in a manner sufficient to survive intermediate scrutiny. For one, Mendon fails to clarify how the traffic effects of adult-entertainment businesses along Route 16 are in any way distinct from the traffic effects that would be caused by any other large, commercial business that might choose to locate along the same stretch of highway. For example, Mendon makes no suggestion that these bylaws would apply to a large restaurant, clothing retailer, or car dealership (all businesses at which we would expect daytime traffic) operating within the Adult-Entertainment Overlay District prior to 4:30 p.m. The record also gives no indication as to how the daytime traffic effects of an adult-entertainment business operating on Showtime's lot would be in any way distinct from, or less severe than, the effects caused by the business it would replace: a 2,600-square-foot, 1.9-story tall landscaping business.

Mendon's reliance on the studies of other municipalities does nothing to render us less dubious of its proffered interest. Having conducted an independent review of these studies, we find that the vast majority make no mention of traffic effects at all. Even those that do discuss traffic do so in a tellingly dissimilar manner relative to Mendon's suggested concern. The sum of these references are provided below:

- A 1979 study conducted by the Planning Department of Phoenix, Arizona states, as a hypothesis, that adult-entertainment business might cause "possible traffic congestion, unusual hours of operation, litter, noise, and criminal activity." The study then goes on to investigate the link between criminal activity and sexually oriented businesses. It never again references traffic concerns.

- A 1980 study by the Minnesota Crime Prevention Center concludes that bars without separate parking facilities, that instead rely on street parking to serve their patrons, are more often "nuisance bars" than those with separate parking facilities.

- A 1991 study commissioned by the City of Garden Grove, California included a survey completed by real-estate agents and city residents. Both groups indicated their belief that adult-entertainment businesses located "within 200 feet of a residential area" would increase traffic. A majority of respondents also felt traffic would be increased in a commercial zone.

- A 1993 report by the St. Croix County, Wisconsin Planning Department found that "[d]uring night time operation hours" there could be problems related to "traffic congestion."

- A 1996 report by the ERG/Environmental Research Group stated, generally, that in small towns with limited downtown commercial retail space, "the likelihood of a cruising circuit for cars in the vicinity of the sex oriented business increases." The report cited

concerns that "a sex oriented business will have the impact of drawing a regional . . . adult, male population . . . that has interests and activities that are at odds with those of families and the elderly."

- A 1997 law review article cited a "concern . . . with drivers who rush out of the parking lots of the business while children are nearby." It continued on to say that "at the core of this concern is the fear of the kind of people a nude dance club attracts."

These references are largely anecdotal, rely nearly exclusively on personal perceptions rather than verifiable data, and include significant hedging language, such as indicating that increased traffic is merely a hypothesis. In several cases, they also make apparent that the true, primary concern is not traffic, but the type of patrons thought to visit adult-entertainment businesses. Also of note is that the studies wholly fail to suggest that patronage at an adult-entertainment business would have any distinct effect when located in already commercialized zones, such as the Adult-Entertainment Overlay District.

Even observing these studies in the light most favorable to Mendon, as we must when considering Showtime's cross-motion for summary judgment, we fail to see how they sufficiently establish that an adult-entertainment business located along a highway, in a commercially zoned area, and with off-street parking accommodations, would have a secondary effect on traffic patterns different from, or worse than, other commercial business of like size and capacity that might open in the same location. See Schad

v. Borough of Mt. Ephraim, 452 U.S. 61, 73 (1981) ("The Borough has presented no evidence, and it is not immediately apparent as a matter of experience, that live entertainment poses problems . . . more significant than those associated with various permitted uses; nor does it appear that the Borough's zoning authority has arrived at a defensible conclusion that unusual problems are presented by live entertainment.").

Similarly, although members of Speak Out Mendon referenced heavy pre-existing traffic on Route 16, "even a traffic regulation cannot discriminate on the basis of content unless there are clear reasons for the distinction[]." Erznoznik, 422 U.S. at 215. This anecdotal reporting does perhaps even less than the studies entered into evidence to substantiate Mendon's claim that increased traffic from an adult-entertainment business is more problematic -- or more likely -- than increased traffic from any other new commercial enterprise choosing to operating within the Adult-Entertainment Overlay District. Nonetheless, it is uncontested that if Showtime chose instead to operate a ballet studio, movie theater, or grocery store, those businesses would not be subject to the bylaws. Schad, 452 U.S. at 73-74 ("We do not find it self-evident that a theater, for example, would create greater parking problems than would a restaurant.").

We note before closing that Mendon does make a limited attempt to argue that adult-entertainment businesses attract a

higher percentage of out-of-town patrons, less concerned with Mendon's quality of life, than other types of commercial activity, resulting in traffic effects unique from that of other businesses.[10] Even if the residency of a driver had some cognizable effect on traffic flow, we find it beyond improbable that Mendon could substantiate any such distinction here, in light of the fact that Route 16 is a state highway running East-West through much of Massachusetts.[11] By way of hypothetical, we can only presume that a large, roadside restaurant offering an early-bird dinner special to patrons as they travel through Mendon along Route 16 headed East towards Boston would likely create the exact same amount of out-of-town traffic at 4:00 p.m., half an hour before any adult-entertainment business is allowed to operate, as Showtime's

---

[10] Because we find this argument to be unavailing for other reasons, we do not address the possibility -- albeit never raised by Showtime -- that a municipality claiming a substantial interest in curbing the frequency at which non-residents visit its city limits could run afoul of a right to intrastate travel. Commonwealth v. Weston W., 455 Mass. 24, 32-33, 913 N.E.2d 832, 840 (2009) ("[T]he Massachusetts Declaration of Rights guarantees a fundamental right to move freely within the Commonwealth."); see also King v. New Rochelle Mun. Hosp. Auth., 442 F.2d 646, 648 (2d Cir. 1971) (describing as "meaningless" the right to interstate travel unless a correlative right to intrastate travel exists). But see Mem. Hosp. v. Maricopa Cnty., 415 U.S. 250, 255-56 (1974) (leaving open the question of whether the U.S. Constitution recognizes a fundamental right to intrastate travel).

[11] A number of other businesses, including the nearby drive-in theater at 35 Milford Street, seem to cater specifically to out-of-town patrons. See www.mendondrivein.com (providing directions to the theater from neighboring cities and states).

preferred building, yet would not find its size or operating hours curtailed in any way.

We therefore find Mendon's reliance on traffic concerns to be tellingly underinclusive, see, e.g., Carey, 447 U.S. at 455-56; Florida Star, 491 U.S. at 540, revealing that Mendon's allegedly substantial interest is not actually furthered by its bylaws, a fact fatal to its claim under intermediate scrutiny. See, e.g., O'Brien, 391 U.S. at 377.

**4. The zoning bylaws support no substantial interest**

We find the zoning bylaws to be tellingly underinclusive, highlighting that Mendon has failed to prove that it has a substantial interest in regulating the secondary effects of adult-entertainment businesses that is actually furthered by its bylaws. The narrow application of these bylaws -- passed in the aftermath of Showtime's initial application for an adult-entertainment license -- to only the four-plot Adult Entertainment Overlay District belies Mendon's proffered interest in traffic safety and rural aesthetics. We believe that the record makes clear that these interests, although theoretically substantial in their own right, are not what prompted Mendon's amendments to the bylaws. See, e.g., Auburn Police Union, 8 F.3d at 897 & n.15 (collecting cases finding that patent underinclusiveness may prove the lack of a substantial governmental interest). Accordingly, we find that it

is Showtime, not Mendon, that ought to have been awarded summary judgment on these claims.

## B. The restriction on sale and consumption of alcohol

Showtime also challenges an amendment to Mendon's general bylaws that forbids the sale or consumption of alcoholic beverages at any adult-entertainment business within the Adult-Entertainment Overlay District. Showtime does not bring this challenge under the First Amendment, but rather asserts that Article 16 of the Massachusetts Declaration of Rights provides more expansive protection for adult entertainment than does its federal counterpart.[12] Citing cases in which the Massachusetts Supreme Judicial Court ("SJC") has held bans on non-obscene nude dancing in bars unconstitutional, Showtime asks us to find that Mendon's "total ban" on such activity is clearly impermissible under Article 16. In the alternative, it requests that we certify this question of law to the SJC. Mendon argues to the contrary, asserting that any distinction between the scope of Article 16 and the First Amendment need not concern us; under either the state or federal

___

[12] The Massachusetts Supreme Judicial Court has made clear that there is no practical distinction between a regulation prohibiting the service of alcohol by businesses that provide adult entertainment and a regulation prohibiting adult entertainment in establishments that serve alcohol. See Cabaret Enters., Inc. v. Alcoholic Beverages Control Comm'n, 393 Mass. 13, 17-18, 468 N.E.2d 612, 615 (1984) (rejecting the argument that an ordinance banning alcohol sales in the presence of nude dancing was only a licensing restriction, not a regulation of expressive activity).

constitution the ban on adult-entertainment occurring in conjunction with alcohol service is clearly constitutional.

As a federal court sitting in diversity over an issue of state law, we are generally tasked with making an "informed prophecy" of how the highest state court would rule on this question. See Ambrose v. New Engl. Ass'n of Sch. & Colls., Inc., 252 F.3d 488, 497-98 (1st Cir. 2001); see also In re Bos. Reg'l Med. Ctr., Inc., 410 F.3d 100, 108 (1st Cir. 2005). However, where our court determines that the path of state law is sufficiently undeveloped, or the correct answer to the question before us sufficiently unclear, so as to make such prophetic action unwise, we may instead choose to certify such questions to the highest court of the state. In re Hundley, 603 F.3d 95, 98 (1st Cir. 2010); Fischer v. Bar Harbor Banking & Trust Co., 857 F.2d 4, 7 (1st Cir. 1988); see also Lehman Bros. v. Schein, 416 U.S. 386, 391 (1974) (holding that the decision to certify a case a question is within the "sound discretion" of federal courts). For issues of Massachusetts law, we may appropriately certify to the SJC "questions of law . . . which may be determinative of the cause then pending . . . and as to which it appears . . . there is no controlling precedent in the decision of [the SJC]." Mass. S.J.C. R. 1.03; see also In re Engage, Inc., 544 F.3d 50, 52 (1st Cir. 2008). This case meets both requirements for certification.

We need not spill much ink on the first requirement: Showtime challenges the restriction on providing adult-entertainment in conjunction with the service of alcohol solely under Article 16 of the Massachusetts Declaration of Rights. Accordingly, there is no question that proper interpretation of state constitutional law is "determinative" of this action.

The second requirement for certification is that there be "no controlling precedent" from the SJC. See Mass. S.J.C. R. 1.03. Our case law has interpreted "no controlling precedent" to mean that certification is inappropriate where "the course the state court would take is reasonably clear." In re Engage, 544 F.3d at 53 (alterations and citation omitted). Where a "case presents close and difficult legal issues," however, we may often be unable to "say that the course that the SJC would take is reasonably clear." Easthampton Sav. Bank v. City of Springfield, 736 F.3d 46, 51 (1st Cir. 2013); see also In re Engage, 544 F.3d at 53. As explained below, this is one such case, and we therefore believe that certification to the SJC is appropriate.

**1. Article 16's protection of adult entertainment**

As Showtime recognizes, Article 16 protects a wider swath of expressive conduct in the form of adult entertainment than does the First Amendment. See, e.g., Mendoza v. Licensing Bd. of Fall River, 444 Mass. 188, 201, 827 N.E.2d 180, 191 (2005) ("[T]he Federal rule does not adequately protect the rights of the citizens

-34-

of Massachusetts under art. 16."). Although nude dancing, as a form of expressive activity, falls only just within the ambit of First Amendment protections, Article 16 draws no distinction between such adult-entertainment and its less prurient expressive counterparts. Cabaret Enters., Inc. v. Alcoholic Beverages Control Comm'n, 393 Mass. 13, 17, 468 N.E.2d 612, 614 (1984) (refusing to "distinguish between barroom-type nude dancing and performances of greater artistic or socially redeeming significance"); see also Mendoza, 827 N.E.2d at 196 ("Although the Supreme Court has said that nude dancing is expressive conduct within the outer perimeters of the First Amendment . . . this court has rejected such qualification under art. 16." (internal quotation marks and citation omitted)).

Similarly, the SJC has made clear that Article 16 offers robust protection to expressive activity occurring in conjunction with the sale or purchase of alcohol. While the Twenty-First Amendment's grant of regulatory power over alcohol sales to the states has historically been read to limit the First Amendment's protection of expressive conduct in establishments licensed to serve alcohol,[13] "no provision of [the Massachusetts Declaration of

---

[13] The Supreme Court has since limited the Twenty-First Amendment's restriction on First Amendment protections. See California v. La Rue, 409 U.S. 109, 118-19 (1972) (recognizing that the Twenty-First Amendment granted states the power to regulate nude dancing where liquor is sold), overruled in part by 44 Liquor Mart, Inc. v. Rhode Island, 517 U.S. 484, 516 (1996) ("We now disavow [LaRue's] reasoning insofar as it relied upon the Twenty-First Amendment.").

Rights] gives a preferred position to regulation of alcoholic beverages." Commonwealth v. Sees, 374 Mass. 532, 536-37, 373 N.E.2d 1151, 1155 (1978). Therefore, unlike its federal counterpart, Article 16 "makes no distinction between 'free speech in a bar and free speech on a stage.'" Mendoza, 827 N.E.2d at 190 n.15 (citing Sees, 373 N.E.2d at 1155); see also Aristocratic Rest. of Mass, Inc. v. Alcoholic Beverage Control Comm'n (No. 1), 374 Mass. 547, 554, 374 N.E.2d 1181, 1186 (1978) ("Because our State Constitution has no special provision like the Twenty-first Amendment concerning the regulation of alcoholic beverages, the right of free speech guaranteed by art. 16 has no parallel limited status in premises where alcoholic beverages are served.").

In accordance with these strong protections, the SJC has consistently held that adult-entertainment occurring in bars is considered constitutionally protected expressive conduct that may not be abridged "in the absence of a demonstrated countervailing State interest." Cabaret Enters., 468 N.E.2d at 614; see id. (holding unconstitutional a ban on nude dancing in bars given the absence of "evidence that [the adult-entertainment facilities have] been the source of crime such as drug distribution or disorderly conduct or assaults or sexual improprieties"); Sees, 373 N.E.2d at 1156 (concluding that a restriction on nude dancing in bars was

_____

The SJC has not had an opportunity to speak to whether a distinction between Article 16 and the First Amendment remains post-LaRue.

-36-

unconstitutional where the dancer "did not mingle with other employees or with patrons, and there is no contention that the performance was obscene"). But see Mendoza, 827 N.E.2d at 188-89 (applying intermediate scrutiny to an ordinance banning all public nudity where the city "at least advanced and attempted to document a governmental interest" in crime deterrence, although withholding judgment as to the ordinance's true content neutrality).

## 2. Article 16's application to the general bylaws

Naturally, the parties draw from this precedent sharply contrasting inferences about the constitutionality of Mendon's amended bylaws. Showtime styles the amendment as a "total ban" on the presentation of adult entertainment in conjunction with the sale or consumption of alcohol, which it claims is a clear violation of the protection offered by Article 16. Mendon, in contrast, argues that the restriction is wholly permissible; unlike the towns in Sees and Cabaret Enters., it has set forth a governmental interest and has crafted the amendment to narrowly target only those businesses most likely to cause the identified secondary effects.

Neither argument wholly convinces. For its part, Showtime fails to acknowledge that Cabaret Enters. and Sees were decided in the absence of any governmental justification for their proposed restrictions on expressive activity. See Mendoza, 827 N.E.2d at 188 ("The records in both [Cabaret Enters. and Sees]

'fail[ed] to demonstrate [any] justification for the imposition of a restraint on the exercise of a right guaranteed by art. 16." (alterations in original) (quoting Cabaret Enters., 468 N.E.2d at 614)). Here, in contrast, Mendon has at least set forth an interest in deterring an increase in criminal activity which it believes will arise if adult entertainment is presented in conjunction with the service of alcohol.

Under intermediate scrutiny,[14] however, Mendon must also show that its interest in crime deterrence is substantial, and that its restriction on expressive activity is "'narrowly tailored' to advance . . . [that] interest 'without at the same time banning or significantly restricting a substantial quantity of speech that does not create the . . . evils [the city seeks to eliminate]." Id. (alterations in original) (quoting City of Bos. v. Back Bay Cultural Ass'n, 418 Mass. 175, 183, 635 N.E.2d at 1179, 1180 (1994)); see also Commonwealth v. Ora, 451 Mass. 125, 129, 883 N.E.2d 1217, 1221 (2008) (stating that under intermediate scrutiny a restriction on speech must be "no greater than is essential to

---

[14] Although Showtime argued that the zoning bylaws were appropriately subject to strict scrutiny, it did not similarly suggest that strict scrutiny should apply to the alcohol ban. Cf. Mendoza, 827 N.E.2d at 188 (considering Mendoza's argument that strict scrutiny should apply despite the proffer of a facially content-neutral interest in combating crime). Therefore, although acknowledging that the alcohol ban was passed concurrently with the zoning bylaw amendments -- the underinclusiveness of which betrays their asserted content-neutral purpose -- we do not consider the application of strict-scrutiny to this claim.

the furtherance of the government interest").  In <u>Mendoza</u> the answer to the second of these inquiries was simple: the ordinance banned any public nudity within city limits, making it "tantamount to censorship."  827 N.E.2d at 189.  Given that the ordinance in <u>Mendoza</u> so clearly failed the test for narrow tailoring, the SJC did not engage in significant analysis of what evidence is required of a city to prove the validity and substantiality of its stated interest.  Neither does <u>Mendoza</u> provide significant guidance on how the SJC would apply the test for narrow tailoring in a case, like that now before us, presenting a much closer question than the citywide ban on public nudity considered in <u>Mendoza</u>.  <u>Cf.</u> <u>id.</u> ("No matter what the formulation of the [narrow tailoring] test, . . . a complete ban is not 'narrowly tailored' . . . .").

In consequence, the SJC's precedents may reasonably be conceived of as staking out two poles of scrutiny, with most cases falling somewhere in between.  On one end, absent any justification, protected adult entertainment in the presence of alcohol service may not be constitutionally abridged.  On the other end, no matter what justification is provided, a total ban on protected activity will not survive narrow tailoring.  Between these poles, however, there are significant open questions regarding Article 16's proper application.  This case, which falls somewhere near the middle of the rules set forth in guiding precedent, thus presents a close issue of constitutional law, the

proper resolution of which is difficult to predict, and suitable for certification to the SJC.

### 3. Certification to the SJC

Although "the legal standards to [be applied in this case] are relatively apparent," "the application of those standards is difficult, and the outcome far from certain."  See Easthampton Sav. Bank, 736 F.3d at 51.  Moreover, the claim rests solely on issues of state constitutional law, implicates a fundamental right of Massachusetts citizens, and may have far-reaching impact on municipalities throughout Massachusetts in their construction of local ordinances.  See In re Engage, 544 F.3d at 57 (explaining that the mere difficulty of a legal issue is generally insufficient to warrant certification, but deeming certification appropriate where additional factors weigh in favor of having the state court decide such complex questions of state law (citing Bos. Gas Co. v. Century Indem. Co., 529 F.3d 8, 15 (2008)).  For these reasons, we believe certification is warranted.[15]

---

[15]   On appeal, Showtime also challenges the amended bylaws as overbroad.  See Stevens, 559 U.S. at 473 (finding  that "a law may be invalidated as overbroad" if "a substantial number of its applications are unconstitutional . . . ."); Aristocratic Rest., 374 N.E.2d 1181, at 1187 (describing the overbreadth analysis under Article 16 as "similar" to the overbreadth analysis under the First Amendment).  Having closely reviewed the record, however, we find no indication that Showtime sought to challenge the restriction on these grounds before the district court, and we cannot reasonably read its arguments therein as setting forth a prima facie argument for overbreadth.  Aristocratic Rest., 374 N.E.2d at 1187 ("[A] party must demonstrate both that the challenged governmental regulation is not susceptible of a construction which limits its

### III. Conclusion

We reverse the grant of summary judgment in favor of Mendon as it relates to the bylaws regarding the size, height, and operating hours of adult-entertainment businesses. We remand this claim to the district court for entry of summary judgment in favor of Showtime.

We certify to the SJC the following questions related to Mendon's restriction on adult entertainment occurring within establishments licensed to serve alcohol:

1. Do the pre-enactment studies and other evidence considered by Mendon demonstrate a "countervailing State interest," Cabaret Enters., 468 N.E.2d at 614, sufficient to justify Mendon's ban on alcohol service at adult-entertainment businesses?

2. If the ban is so justified, is it adequately tailored?

We would further welcome the advice of the SJC on any other relevant aspect of Massachusetts law that it believes would aid in resolution of this dispute.

---

application to unprotected activity and that the deterrent effect of any government regulation is both real and substantial." (citations and internal quotation marks omitted)); see also N.Y. State Club Ass'n v. City of N.Y., 487 U.S. 1, 14 (1988) ("[A]ppellant must demonstrate from the text of [the bylaw] and from actual fact that a substantial number of instances exist in which the Law cannot be applied constitutionally."). Therefore, the claim is properly deemed waived on appeal. See Demelo v. U.S. Bank Nat'l Ass'n, 727 F.3d 117, 123 (1st Cir. 2013). Consequently, any issue of overbreadth is not determinative in this case, making certification of this issue unnecessary. See S.J.C. R. 1.03.

The Clerk of this Court is directed to forward to the Massachusetts SJC, under the official seal of this court, a copy of the certified questions and this opinion, along with a copy of the briefs and appendices filed by the parties.  We retain jurisdiction over this issue pending the SJC's response.

**So ordered.**