Justice Thomas
delivered the opinion of the Court.
In 2004, voters in the State of Washington passed an initiative changing the State’s primary election system. The People’s Choice Initiative of 2004, or Initiative 872 (1-872), provides that candidates for office shall be identified on the ballot by their self-designated “party preference”; that voters may vote for any candidate; and that the top two votegetters for each office, regardless of party preference, advance to the general election. The Court of Appeals for the Ninth Circuit held 1-872 facially invalid as imposing an unconstitutional burden on state political parties’ First Amendment rights. Because 1-872 does not on its face impose a severe burden on political parties’ associational rights, and because respondents’ arguments to the contrary rest on factual assumptions about voter confusion that can be evaluated only in the context of an as-applied challenge, we reverse.
*445 I
For most of the past century, Washington voters selected nominees for state and local offices using a blanket primary.[1] From 1935 until 2003, the State used a blanket primary that placed candidates from all parties on one ballot and allowed voters to select a candidate from any party. See 1935 Wash. Laws §§1-5, pp. 60-64. Under this system, the candidate who won a plurality of votes within each major party became that party’s nominee in the general election. See 2003 Wash. Laws § 919, p. 775.
California used a nearly identical primary in its own elections until our decision in California Democratic Party v. Jones, 530 U. S. 567 (2000). In Jones, four political parties challenged California’s blanket primary, arguing that it unconstitutionally burdened their associational rights by forcing them to associate with voters who did not share their beliefs. We agreed and struck down the blanket primary as inconsistent with the First Amendment. In so doing, we emphasized the importance of the nomination process as “ ‘the crucial juncture at which the appeal to common principles may be translated into concerted action, and hence to political power in the community.’” Id., at 575 (quoting Tashjian v. Republican Party of Conn., 479 U. S. 208, 216 (1986)). We observed that a party’s right to exclude is central to its freedom of association, and is never “more important than in the process of selecting its nominee.” 530 U. S., at 575. California’s blanket primary, we concluded, severely burdened the parties’ freedom of association because it *446 forced them to allow nonmembers to participate in selecting the parties’ nominees. That the parties retained the right to endorse their preferred candidates did not render the burden any less severe, as “[t]here is simply no substitute for a party’s selecting its own candidates.” Id., at 581.
Because California’s blanket primary severely burdened the parties’ associational rights, we subjected it to strict scrutiny, carefully examining each of the state interests offered by California in support of its primary system. We rejected as illegitimate three of the asserted interests: “producing elected officials who better represent the electorate,” “expanding candidate debate beyond the scope of partisan concerns,” and ensuring “the right to an effective vote” by allowing nonmembers of a party to vote in the majority party’s primary in “ ‘safe’ ” districts. Id., at 582-584. We concluded that the remaining interests — promoting fairness, affording voters greater choice, increasing voter participation, and protecting privacy — were not compelling on the facts of the case. Even if they were, the partisan California primary was not narrowly tailored to further those interests because a nonpartisan blanket primary, in which the top two votegetters advance to the general election regardless of party affiliation, would accomplish each of those interests without burdening the parties’ associational rights. Id., at 585-586. The nonpartisan blanket primary had “all the characteristics of the partisan blanket primary, save the constitutionally crucial one: Primary voters [were] not choosing a party’s nominee.” Ibid.
After our decision in Jones, the Court of Appeals for the Ninth Circuit struck down Washington’s primary as “materially indistinguishable from the California scheme.” Democratic Party of Washington State v. Reed, 343 F. 3d 1198, 1203 (2003). The Washington State Grange[2] promptly pro *447 posed 1-872 as a replacement.[3] It passed with nearly 60% of the vote and became effective in December 2004.
Under 1-872, all elections for “partisan offices”[4] are conducted in two stages: a primary and a general election. To participate in the primary, a candidate must file a “declaration of candidacy” form, on which he declares his “major or minor party preference, or independent status.” Wash. Rev. Code §29A.24.030 (Supp. 2005). Each candidate and his party preference (or independent status) is in turn designated on the primary election ballot. A political party cannot prevent a candidate who is unaffiliated with, or even repugnant to, the party from designating it as his party of preference. See App. 396-397, 595 (declaration of James K. Pharris, Exhibit C: Ruling Order, May 18, 2005, Wash. Admin. Code §434-215-015). In the primary election, voters may select “any candidate listed on the ballot, regardless of the party preference of the candidates or the voter.” Id., at 606, §434-262-012.
The candidates with the highest and second-highest vote totals advance to the general election, regardless of their *448 party preferences. Ibid. Thus, the general election may pit two candidates with the same party preference against one another.[5] Each candidate’s party preference is listed on the general election ballot, and may not be changed between the primary and general elections. See id., at 601, § 434-230-040.
Immediately after the State enacted regulations to implement 1-872, the Washington State Republican Party filed suit against a number of county auditors challenging the law on its face. The party contended that the new system violates its associational rights by usurping its right to nominate its own candidates and by forcing it to associate with candidates it does not endorse. The Washington State Democratic Central Committee and Libertarian Party of Washington State joined the suit as plaintiffs. The Washington State Grange joined as a defendant, and the State of Washington was substituted for the county auditors as defendant. The United States District Court for the Western District of Washington granted the political parties’ motions for summary judgment and enjoined the implementation of 1-872. See Washington State Republican Party v. Logan, 377 F. Supp. 2d 907, 932 (2005).
The Court of Appeals affirmed. 460 F. 3d 1108, 1125 (CA9 2006). It held that the 1-872 primary severely burdens the political parties’ associational rights because the party-preference designation on the ballot creates a risk that primary winners will be perceived as the parties’ nominees and produces an “impression of associatio[n]” between a candidate and his party of preference even when the party does not associate, or wish to be associated, with the candidate. Id., at 1119. The Court of Appeals noted a “constitutionally *449 significant distinction between ballots and other vehicles for political expression,” reasoning that the risk of perceived association is particularly acute when ballots include party labels because such labels are typically used to designate candidates’ views on issues of public concern. Id., at 1121. And it determined that the State’s interests underlying 1-872 were not sufficiently compelling to justify the severe burden on the parties’ association. Concluding that the provisions of 1-872 providing for the party-preference designation on the ballot were not severable, the court struck down 1-872 in its entirety.
We granted certiorari, 549 U. S. 1251 (2007), to determine whether 1-872, on its face, violates the political parties’ associational rights.
II
Respondents object to 1-872 not in the context of an actual election, but in a facial challenge. Under United States v. Salerno, 481 U. S. 739 (1987), a plaintiff can only succeed in a facial challenge by “establish[ing] that no set of circumstances exists under which the Act would be valid,” i. e., that the law is unconstitutional in all of its applications. Id., at 745. While some Members of the Court have criticized the Salerno formulation, all agree that a facial challenge must fail where the statute has a “‘plainly legitimate sweep.’” Washington v. Glucksberg, 521 U. S. 702, 739-740, and n. 7 (1997) (Stevens, J., concurring in judgments). Washington’s primary system survives under either standard, as we explain below.[6] In determining whether a law is facially in *450 valid, we must be careful not to go beyond the statute’s facial requirements and speculate about “hypothetical” or “imaginary” cases. See United States v. Raines, 362 U. S. 17, 22 (1960) (“The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases thus imagined”). The State has had no opportunity to implement 1-872, and its courts have had no occasion to construe the law in the context of actual disputes arising from the electoral context, or to accord the law a limiting construction to avoid constitutional questions. Cf. Yazoo & Mississippi Valley R. Co. v. Jackson Vinegar Co., 226 U. S. 217, 220 (1912) (“How the state court may apply [a statute] to other cases, whether its general words may be treated as more or. less restrained, and how far parts of it may be sustained if others fail are matters upon which we need not speculate now”). Exercising judicial restraint in a facial challenge “frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy.” Raines, supra, at 22.
Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of “premature interpretation of statutes on the basis of factually barebones records.” Sabri v. United States, 541 U. S. 600, 609 (2004) (internal quotation marks and brackets omitted). Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither “ ‘anticipate a question of constitutional law in advance of the necessity of deciding it’ ” nor “ ‘formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.’” Ashwander v. TVA, 297 U. S. 288, 346-347 (1936) (Brandeis, J., concurring) (quoting Liverpool, New York & Philadelphia *451 S. S. Co. v. Commissioners of Emigration, 113 U. S. 33, 39 (1885)). Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that “ ‘[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.’ ” Ayotte v. Planned Parenthood of Northern New Eng., 546 U. S. 320, 329 (2006) (quoting Regan v. Time, Inc., 468 U. S. 641, 652 (1984) (plurality opinion)). It is with these principles in view that we turn to the merits of respondents’ facial challenge to 1-872.
A
The States possess a “‘broad power to prescribe the “Times, Places and Manner of holding Elections for Senators and Representatives,” Art. I, § 4, cl. 1, which power is matched by state control over the election process for state offices.’ ” Clingman v. Beaver, 544 U. S. 581, 586 (2005) (quoting Tashjian, 479 U. S., at 217); Timmons v. Twin Cities Area New Party, 520 U. S. 351, 358 (1997) (same). This power is not absolute, but is “subject to the limitation that [it] may not be exercised in a way that violates . . . specific provisions of the Constitution.” Williams v. Rhodes, 393 U. S. 23, 29 (1968). In particular, the State has the “ ‘responsibility to observe the limits established by the First Amendment rights of the State’s citizens,’ ” including the freedom of political association. Eu v. San Francisco County Democratic Central Comm., 489 U. S. 214, 222 (1989) (quoting Tashjian, supra, at 217).
Election regulations that impose a severe burden on associational rights are subject to strict scrutiny, and we uphold them only if they are “narrowly tailored to serve a compelling state interest.” Clingman, supra, at 586; see also Rhodes, supra, at 31 (“ ‘[0]nly a compelling state interest in the regulation of a subject within the State’s constitutional power to regulate can justify limiting First Amendment *452 freedoms’ ” (quoting NAACP v. Button, 371 U. S. 415, 438 (1963))). If a statute imposes only modest burdens, however, then “the State’s important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions” on election procedures. Anderson v. Celebrezze, 460 U. S. 780, 788 (1983). “Accordingly, we have repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls.” Burdick v. Takushi, 504 U. S. 428, 438 (1992).
The parties do not dispute these general principles; rather, they disagree about whether 1-872 severely burdens respondents’ associational rights. That disagreement begins with Jones. Petitioners argue that the 1-872 primary is indistinguishable from the alternative Jones suggested would be constitutional. In Jones we noted that a nonpartisan blanket primary, where the top two votegetters proceed to the general election regardless of their party, was a less restrictive alternative to California’s system because such a primary does not nominate candidates. 530 U. S., at 585-586 (The nonpartisan blanket primary “has all the characteristics of the partisan blanket primary, save the constitutionally crucial one: Primary voters are not choosing a party’s nominee”). Petitioners are correct that we assumed that the nonpartisan primary we described in Jones would be constitutional. But that is not dispositive here because we had no occasion in Jones to determine whether a primary system that indicates each candidate’s party preference on the ballot, in effect, chooses the parties’ nominees.
That question is now squarely before us. Respondents argue that 1-872 is unconstitutional under Jones because it has the same “constitutionally crucial” infirmity that doomed California’s blanket primary: It allows primary voters who are unaffiliated with a party to choose the party’s nominee. Respondents claim that candidates who progress to the general election under 1-872 will become the de facto nominees *453 of the parties they prefer, thereby violating the parties’ right to choose their own standard bearers, see Timmons, supra, at 359, and altering their messages. They rely on our statement in Jones reaffirming “the special place the First Amendment reserves for, and the special protection it accords, the process by which a political party ‘select[s] a standard bearer who best represents the party’s ideologies and preferences.’” Jones, 530 U.S., at 575 (quoting Eu, supra, at 224).
The flaw in this argument is that, unlike the California primary, the 1-872 primary does not, by its terms, choose parties’ nominees. The essence of nomination — the choice of a party representative — does not occur under 1-872. The law never refers to the candidates as nominees of any party, nor does it treat them as such. To the contrary, the election regulations specifically provide that the primary “does not serve to determine the nominees of a political party but serves to winnow the number of candidates to a final list of two for the general election.” App. 606, Wash. Admin. Code §434-262-012. The top two candidatés from the primary election proceed to the general election regardless of their party preferences. Whether parties nominate their own candidates outside the state-run primary is simply irrelevant. In fact, parties may now nominate candidates by whatever mechanism they choose because 1-872 repealed Washington’s prior regulations governing party nominations.[7]
*454 Respondents counter that, even if the 1-872 primary does not actually choose parties’ nominees, it nevertheless burdens their associational rights because voters will assume that candidates on the general election ballot are the nominees of their preferred parties. This brings us to the heart of respondents’ case — and to the fatal flaw in their argument. At bottom, respondents’ objection to 1-872 is that voters will be confused by candidates’ party-preference designations. Respondents’ arguments are largely variations on this theme. Thus, they argue that even if voters do not assume that candidates on the general election ballot are the nominees of their parties, they will at least assume that the parties associate with, and approve of, them. This, they say, compels them to associate with candidates they do not endorse, alters the messages they wish to convey, and forces them to engage in counterspeech to disassociate themselves from the candidates and their positions on the issues.
We reject each of these contentions for the same reason: They all depend, not on any facial requirement of 1-872, but on the possibility that voters will be confused as to the meaning of the party-preference designation. But respondents’ assertion that voters will misinterpret the party-preference designation is sheer speculation. It “depends upon the belief that voters can be ‘misled’ by party labels. But ‘[o]ur cases reflect a greater faith in the ability of individual voters to inform themselves about campaign issues.’” Tashjian, 479 U. S., at 220 (quoting Anderson, swpra, at 797). There is simply no basis to presume that a well-informed electorate will interpret a candidate’s party-preference designation to mean that the candidate is the party’s chosen nominee or representative or that the party associates with or approves of the candidate. See New York State Clubn Assn., Inc. v. City of New York, 487 U. S. 1, 13-14 (1988) *455 (rejecting a facial challenge to a law regulating club membership and noting that “[w]e could hardly hold otherwise on the record before us, which contains no specific evidence on the characteristics of any club covered by the [l]aw”). This strikes us as especially true here, given that it was the voters of Washington themselves, rather than their elected representatives, who enacted 1-872.
Of course, it is possible that voters will misinterpret the candidates’ party-preference designations as reflecting endorsement by the parties. But these cases involve a facial challenge, and we cannot strike down 1-872 on its face based on the mere possibility of voter confusion. See Yazoo, 226 U. S., at 219 (“[T]his court must deal with the case in hand and not with imaginary ones”); Pullman Co. v. Knott, 235 U. S. 23, 26 (1914) (A statute “is not to be upset upon hypothetical and unreal possibilities, if it would be good upon the facts as they are”). Because respondents brought their suit as a facial challenge, we have no evidentiary record against which to assess their assertions that voters will be confused. See Timmons, 520 U. S., at 375-376 (Stevens, J., dissenting) (rejecting judgments based on “imaginative theoretical sources of voter confusion” and “entirely hypothetical” outcomes). Indeed, because 1-872 has never been implemented, we do not even have ballots indicating how party preference will be displayed. It stands to reason that whether voters will be confused by the party-preference designations will depend in significant part on the form of the ballot. The Court of Appeals assumed that the ballot would not place abbreviations like “ ‘D’ ” and “ ‘R,’ ” or “ ‘Dem.’ ” and “‘Rep.’” after the names of candidates, but would instead “clearly state that a particular candidate ‘prefers’ a particular party.” 460 F. 3d, at 1121, n. 20. It thought that even such a clear statement did too little to eliminate the risk of voter confusion.
But we see no reason to stop there. As long as we are speculating about the form of the ballot — and we can do no *456 more than speculate in this facial challenge — we must, in fairness to the voters of the State of Washington who enacted 1-872 and in deference to the executive and judicial officials who are charged with implementing it, ask whether the ballot could conceivably be printed in such a way as to eliminate the possibility of widespread voter confusion and with it the perceived threat to the First Amendment. See Ayotte, 546 U. S., at 329 (noting that courts should not nullify more of a state law than necessary so as to avoid frustrating the intent of the people and their duly elected representatives); Ward v. Rock Against Racism, 491 U. S. 781, 795-796 (1989) (“ ‘[I]n evaluating a facial challenge to a state law, a federal court must... consider any limiting construction that a state court or enforcement agency has proffered’ ” (quoting Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U. S. 489, 494, n. 5 (1982))).
It is not difficult to conceive of such a ballot. For example, petitioners propose that the actual 1-872 ballot could include prominent disclaimers explaining that party preference reflects only the self-designation of the candidate and not an official endorsement by the party. They also suggest that the ballots might note preference in the form of a candidate statement that emphasizes the candidate’s personal determination rather than the party’s acceptance of the candidate, such as “my party preference is the Republican Party.” Additionally, the State could decide to educate the public about the new primary ballots through advertising or explanatory materials mailed to voters along with their ballots.[8] We are satisfied that there are a variety of ways in which the State could implement 1-872 that would eliminate any real threat of voter confusion. And without the spec *457 ter of widespread voter confusion, respondents’ arguments about forced association[9] and compelled speech[10] fall flat.
Our conclusion that these implementations of 1-872 would be consistent with the First Amendment is fatal to respondents’ facial challenge. See Schall v. Martin, 467 U. S. 253, 264 (1984) (a facial challenge fails where “at least some” constitutional applications exist). Each of their arguments rests on factual assumptions about voter confusion, and each fails for the same reason: In the absence of evidence, we cannot assume that Washington’s voters will be misled. See Jones, 530 U. S., at 600 (Stevens, J., dissenting) (“[A]n empirically debatable assumption ... is too thin a reed to support a credible First Amendment distinction” between permissible and impermissible burdens on association). That *458 factual determination must await an as-applied challenge. On its face, 1-872 does not impose any severe burden on respondents’ associational rights.
B
Because we have concluded that 1-872 does not severely burden respondents, the State need not assert a compelling interest. See Clingman, 544 U. S., at 593 (“When a state electoral provision places no heavy burden on associational rights, ‘a State’s important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions’ ” (quoting Timmons, 520 U. S., at 358)). The State’s asserted interest in providing voters with relevant information about the candidates on the ballot is easily sufficient to sustain 1-872. See Anderson, 460 U. S., at 796 (“There can be no question about the legitimacy of the State’s interest in fostering informed and educated expressions of the popular will in a general election”).[11]
Ill
Respondents ask this Court to invalidate a popularly enacted election process that has never been carried out. Immediately after implementing regulations were enacted, respondents obtained a permanent injunction against the enforcement of 1-872. The First Amendment does not require this extraordinary and precipitous nullification of the will of the people. Because 1-872 does not on its face provide for *459 the nomination of candidates or compel political parties to associate with or endorse candidates, and because there is no basis in this facial challenge for presuming that candidates’ party-preference designations will confuse voters, 1-872 does not on its face severely burden respondents’ associational rights. We accordingly hold that 1-872 is facially constitutional. The judgment of the Court of Appeals is reversed.

It is so ordered.

 The term “blanket primary” refers to a system in which “any person, regardless of party affiliation, may vote for a party’s nominee.” California Democratic Party v. Jones, 530 U. S. 567, 576, n. 6 (2000). A blanket primary is distinct from an “open primary,” in which a person may vote for any party’s nominees, but must choose among that party’s nominees for all offices, ibid., and the more traditional “closed primary,” in which “only persons who are members of the political party . . . can vote on its nominee,” id., at 570.

 The Washington State Grange is a fraternal, social, and civic organization chartered by the National Grange in 1889. Although originally formed to represent the interests of farmers, the organization has advo *447 cated a variety of goals, including women’s suffrage, rural electrification, protection of water resources, and universal telephone service. The State
Grange also supported the Washington constitutional amendment establishing initiatives and referendums and sponsored the 1934 blanket primary initiative.

 Respondents make much of the fact that the promoters of 1-872 presented it to Washington voters as a way to preserve the primary system in place from 1935 to 2003. But our task is not to judge 1-872 based on its promoters’ assertions about its similarity, or lack thereof, to the unconstitutional primary; we must evaluate the constitutionality of 1-872 on its own terms. Whether the language of 1-872 was purposely drafted to survive a Jones-type constitutional challenge is irrelevant to whether it has successfully done so.

 “ ‘Partisan office’ means a public office for which a candidate may indicate a political party preference on his or her declaration of candidacy and have that preference appear on the primary and general election ballot in conjunction with his or her name.” Wash. Rev. Code §29A.04.110 (Supp. 2005).

 This is not a hypothetical outcome. The Court of Appeals observed that, had the 1996 gubernatorial primary been conducted under the L-872 system, two Democratic candidates and no Republican candidate would have advanced from the primary to the general election. See 460 F. 3d 1108,1114, n. 8 (CA9 2006).

 Our eases recognize a second type of facial challenge in the First Amendment context under which a law may be overturned as impermissibly overbroad because a “substantial number” of its applications are unconstitutional, ‘“judged in relation to the statute’s plainly legitimate sweep.’ ” New York v. Ferber, 458 U. S. 747, 769-771 (1982) (quoting Broadrick v. Oklahoma, 413 U. S. 601, 615 (1973)). We generally do not apply the “‘strong medicine’” of overbreadth analysis where the parties fail to describe the instances of arguable overbreadth of the contested *450 law. See New York State Club Assn., Inc. v. City of New York, 487 U. S. 1, 14 (1988).

 It is true that parties may no longer indicate their nominees on the ballot, but that is unexceptionable: The First Amendment does not give political parties a right to have their nominees designated as such on the ballot. See Timmons v. Twin Cities Area New Party, 520 U. S. 351, 362-363 (1997) (“We are unpersuaded, however, by the party’s contention that it has a right to use the ballot itself to send a particularized message, to its candidate and to the voters, about the nature of its support for the candidate”). Parties do not gain such a right simply because the State affords candidates the opportunity to indicate their party preference on *454 the ballot. “Ballots serve primarily to elect candidates, not as forums for political expression.” Id., at 363.

 Washington counties have broad authority to conduct elections entirely by mail ballot rather than at in-person polling places. See Wash. Rev. Code § 29A.48.010. As a result, over 90% of Washington voters now vote by mail. See Tr. of Oral Arg. 11.

 Respondents rely on Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc., 515 U. S. 557 (1995) (holding that a State may not require a parade to include a group if the parade’s organizer disagrees with the group’s message), and Boy Scouts of America v. Dale, 530 U. S. 640 (2000) (holding that the Boy Scouts’ freedom of expressive association was violated by a state law requiring the organization to admit a homosexual scoutmaster). In those cases, actual association threatened to distort the groups’ intended messages. We are aware of no case in which the mere impression of association was held to place a severe burden on a group’s First Amendment rights, but we need not decide that question here.

 Relying on Pacific Gas & Elec. Co. v. Public Util. Comm’n of Cal., 475 U. S. 1 (1986) (holding that a state agency may not require a utility company to include a third-party newsletter in its billing envelope), respondents argue that the threat of voter confusion will force them to speak to clarify their positions. Because 1-872 does not actually force the parties to speak, however, Pacific Gas & Elec, is inapposite. 1-872 does not require the parties to reproduce another’s speech against their will; nor does it co-opt the parties’ own conduits for speech. Rather, it simply provides a place on the ballot for candidates to designate their party preferences. Facilitation of speech to which a political party may choose to respond does not amount to forcing the political party to speak. Cf. Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U. S. 47, 64-65 (2006).

 Respondent Libertarian Party of Washington argues that 1-872 is unconstitutional because of its implications for ballot access, trademark protection of party names, and campaign finance. We do not consider the ballot access and trademark arguments as they were not addressed below and are not encompassed by the question on which we granted certiorari: “Does Washington’s primary election system .. . violate the associational rights of political parties because candidates are permitted to identify their political party preference on the ballot?” Pet. for Cert, in No. 06-730, p. i. The campaign finance issue also was not addressed below and is more suitable for consideration on remand.