Admittedly, the Obergefell majority assumed same- and opposite-sex couples would receive the same benefits, reasoning that "[w]ere the Court to stay its hand to allow slower, case-by-case determination of the required availability of specific public benefits to same-sex couples, it still would deny gays and lesbians many rights and responsibilities intertwined with marriage." Id. at 2606. The Court described the many benefits married couples enjoy, noting that no difference exists "between same- and opposite-sex couples with respect to" how the states have "contributed to the fundamental character" of marriage by tying so many rights and responsibilities to it. Id. at 2601. Yet, the fact remains that, at most, the majority merely described the benefits that states confer on married couples and assumed states would extend them to all married couples. Generalized assumptions about state laws do not constitute a legal holding, much less sweep aside well-established standards of review.
Lest there be any doubt about Obergefell 's limited role when fundamental rights are not at stake, the Supreme Court has repeatedly (even more recently than Obergefell ) admonished that
[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [other courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.
Hurst v. Florida , --- U.S. ----, ----, 136 S.Ct. 616, 623, 193 L.Ed.2d 504 (2016) (alteration in original) (quoting another source); see also Rodriguez de Quijas v. Shearson/Am. Express, Inc. , 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). To the extent Obergefell 's wording casts doubt on the traditional deference owed to the democratic process when neither fundamental rights nor suspect classes are involved, we must still follow the Supreme Court's well-established Equal Protection jurisprudence.
B
The "[i]nherent differences between men and women" are, as Justice Ginsburg once explained, "cause for celebration." United States v. Virginia , 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996). The "two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both." Id. (alteration in original) (quoting Ballard v. United States , 329 U.S. 187, 193, 67 S.Ct. 261, 91 L.Ed. 181 (1946) ). Surely the same is true in marriage, the closest and most intimate of communities in our nation. Yet, by applying strict scrutiny, the court of appeals foreclosed any argument that the State has a legitimate or important interest in celebrating these differences when they occur in marriage.
Consider the State's interest in encouraging procreation. The State may well have believed that offering certain benefits to opposite-sex couples would encourage procreation within marriage. After all, benefits such as health insurance provide financial security as couples decide whether to have a child. An opposite-sex marriage is the only marital relationship where children are raised by their biological parents. In any other relationship, the child must *134 be removed from at least one natural parent, perhaps two, before being adopted by her new parent(s). This does not diminish any child's inherent dignity, a fact the City presumably recognizes by extending benefits to their employees' children regardless of the employees' marital status. But it does explain why the State might choose to direct resources to opposite-sex couples.
Conversely, at least five justices of the Supreme Court have reasoned that the government has a compelling interest in ensuring access to contraception. See Burwell v. Hobby Lobby Stores, Inc. , --- U.S. ----, ---- - ----, 134 S.Ct. 2751, 2785-86, 189 L.Ed.2d 675 (2014) (Kennedy, J., concurring); id. at 2787, 2799 (Ginsburg, J., dissenting, joined by Justices Breyer, Kagan, and Sotomayor). Obviously, any government interest in providing access to contraceptives is linked to opposite-sex couples: they must plan not to get pregnant, whereas same-sex couples must undergo extensive planning and preparation before adopting or using in-vitro fertilization. Again, differences exist between same- and opposite-sex couples, and such differences may explain the State's allocation of benefits.
Admittedly, the State's policy is not perfect. Not all opposite-sex couples want, or are even capable of, procreation. But if rational-basis review instead of strict scrutiny applies, then the imperfections are not fatal. "The rationality commanded by the Equal Protection Clause does not require States to match [class] distinctions and the legitimate interests they serve with razorlike precision." Kimel v. Fla. Bd. of Regents , 528 U.S. 62, 83-84, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (discussing age discrimination). At times, the State may rely on one characteristic-such as the opposite-sex nature of a marriage-as a proxy for other abilities-such as procreation within marriage-that relate to the State's interests. See ids="9476145" index="58" url="https://cite.case.law/us/528/62/#p83">id. at 84, 120 S.Ct. 631 (discussing age as a proxy for other traits). It is enough that there is "a rational reason for the difference" in treatment. Engquist v. Or. Dep't of Agric., 553 U.S. 591, 602, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008).
The State's policy is viable even under intermediate scrutiny, which is traditionally reserved for gender-based discrimination. See, e.g., Virginia, 518 U.S. at 532-33, 116 S.Ct. 2264 (discussing gender discrimination). Such discrimination "violates equal protection unless it serves important governmental objectives and [ ] the discriminatory means employed are substantially related to the achievement of those objectives." United States v. Morrison , 529 U.S. 598, 620, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (internal quotation marks omitted). Although sex-based distinctions must rest on more than "overbroad generalizations about the different talents, capacities, or preferences of males and females," government may still recognize physical and inherent differences between men and women. Virginia , 518 U.S. at 533, 116 S.Ct. 2264.
Chief among the "biological difference[s]" recognized by the Court is the capacity for childbirth. See Nguyen v. INS , 533 U.S. 53, 64, 121 S.Ct. 2053, 150 L.Ed.2d 115 (2001). For example, that the mother but not the father must be physically present at their child's birth justifies different naturalization requirements for children born abroad to an American father as opposed to an American mother. Id. at 64, 66-67, 121 S.Ct. 2053. That "[o]nly women may become pregnant" justifies criminalizing a man's act of having sexual intercourse with an underage female without similarly penalizing women for having intercourse with an underage male. See *135 Michael M. v. Super. Ct. of Sonoma Cnty. , 450 U.S. 464, 471-73, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981) (plurality opinion). And that only opposite-sex couples may procreate justifies limiting government incentives and security for childbearing to spouses of the opposite sex from the City's employees.
Some may argue that animus motivated Texas' law. When the legislature acts only out of "animus toward the class it affects," the law lacks a legitimate basis and is facially invalid. Romer , 517 U.S. at 632, 635-36, 116 S.Ct. 1620 (striking down provision of Colorado Constitution); see also Windsor , 133 S.Ct. at 2693. Yet, for the provision to be facially unconstitutional, there must be "no set of circumstances under which [it] would be valid," or it must lack any "plainly legitimate sweep." United States v. Stevens , 559 U.S. 460, 472-73, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) (quoting other sources); Wash. State Grange v. Wash. State Republican Party , 552 U.S. 442, 449, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008).
Here, insofar as the Texas law allocates benefits that were granted to encourage procreation within a family, the law clearly has a legitimate sweep. The constitutionality of the Defense of Marriage Act, struck down in United States v. Windsor , is irrelevant. The Court in Windsor held Congress had no legitimate purpose in withholding federal marital rights and responsibilities from same-sex couples validly married under state law. Windsor , 133 S.Ct. at 2693-94. But the Court's reasoning emphasized that Congress could not defy the classification already made by state law, and it did not prohibit states from deciding on their own how to allocate marital benefits. See id.
If the government may extend benefits to some disabled persons but disqualify others based on who they marry, Jobst , 434 U.S. at 57-58, 98 S.Ct. 95, or provide survivors' benefits to some widows who remarry but deny them to others, Bowen , 476 U.S. at 350, 106 S.Ct. 1881, then surely the State may limit spousal employment benefits to spouses of the opposite sex. Only these spouses are capable of procreation within their marriage, and the State has an interest in encouraging such procreation. The State's policy "seeks to foster the opportunity for meaningful parent-child bonds to develop," and therefore "has a close and substantial bearing on the governmental interest in the actual formation of that bond." See Nguyen , 533 U.S. at 70, 121 S.Ct. 2053. By misapplying Obergefell , the court of appeals overlooked this legitimate and important interest.
* * *
Texas, as it allocates benefits to employees' spouses, may recognize the differences between same- and opposite-sex spouses. To withhold this decision from the people is to undermine precedent, democracy, and the limited role of courts in our nation. It bears repeating that the Supreme Court in Obergefell embraced "democracy [as] the appropriate process for change, so long as that process does not abridge fundamental rights." 135 S.Ct. at 2605. I would take the Court at its word. Because the court of appeals did not, I respectfully dissent to the denial of the petition for review.