Justice NEWBY dissenting.
This case presents the question of whether the General Assembly has the authority to create an independent, bipartisan board to administer the laws of elections, ethics, lobbying, and campaign finance. Because the state constitution expressly commits this specific power to the legislative branch, this Court lacks the authority to intervene;
**428 the issue presents a nonjusticiable political question. In exercising judicial power under these circumstances, this Court violates the very separation-of-powers principle it claims to protect. The Court strips the General Assembly of its historic, constitutionally prescribed authority to make the laws and creates a novel and sweeping constitutional power in the office of Governor-the authority to implement personal policy preferences. In doing so, the Court ignores the carefully crafted, express constitutional roles of the political branches and boldly inserts the judiciary into the political, legislative process. If the Court should reach the merits, I would agree with the analysis of Chief Justice Martin's dissent; however, because the trial court correctly held that this case presents a nonjusticiable political question, I dissent separately.
Under the state constitution, the General Assembly considers various policy alternatives, and those measures enacted become the laws. The Governor may influence the lawmaking process and can even veto a measure. Nevertheless, once the General Assembly passes a law, the constitution requires the Governor to "faithfully" execute "the laws." "The laws" are not the Governor's policy preferences, but are those measures enacted by the General Assembly.
I.
The idea of the judiciary preventing the legislature, through which the people act, from exercising its power is the most serious of judicial considerations. State ex rel. McCrory v. Berger , 368 N.C. 633, 650, 781 S.E.2d 248, 259 (2016) (Newby, J., concurring in part and dissenting in part). As the agent of the people's sovereign power, State ex rel. Ewart v. Jones , 116 N.C. 570, 570, 21 S.E. 787, 787 (1895), the General Assembly has the presumptive power to act, State ex rel. Martin v. Preston , 325 N.C. 438, 448, 385 S.E.2d 473, 478 (1989) ("[G]reat deference will be paid to acts of the legislature-the agent of the people for enacting laws."). Possessing plenary power, the General Assembly is only limited by the express terms of the constitution. McIntyre v. Clarkson , 254 N.C. 510, 515, 119 S.E.2d 888, 891-92 (1961).
When this Court strikes down an act of the General Assembly, it prevents an act of the people themselves. Baker v. Martin , 330 N.C. 331, 336-37, 410 S.E.2d 887, 890 (1991) ; see also McIntyre , 254 N.C. at 515, 119 S.E.2d at 891 ("The courts will not disturb an act of the law-making body unless it runs counter to a constitutional limitation or prohibition.").[1] A **429 constitutional limitation upon *121 the General Assembly must be expressed in the constitutional text. Preston , 325 N.C. at 448-49, 385 S.E.2d at 478 ("All power which is not expressly limited by the people in our State Constitution remains with the people, and an act of the people through their representatives in the legislature is valid unless prohibited by that Constitution." (citations omitted)). Thus, a claim that a law is unconstitutional must surmount the high bar imposed by the presumption of constitutionality and meet the highest quantum of proof, a showing that the statute is unconstitutional beyond a reasonable doubt. Baker , 330 N.C. at 334-37, 410 S.E.2d at 889-90.
II.
Since 1776 our constitutions have recognized that all political power resides in the people, N.C. Const. art. I, § 2 ; N.C. Const. of 1868, art. I, § 2 ; N.C. Const. of 1776, Declaration of Rights § I, and is exercised through their elected officials in the General Assembly, N.C. Const. art. II, § 1 ; N.C. Const. of 1868, art. II, § 1 ; N.C. Const. of 1776, § I. See Jones , 116 N.C. at 570, 21 S.E. at 787 ; see also John V. Orth & Paul Martin Newby, The North Carolina State Constitution 95 (2d ed. 2013) [hereinafter State Constitution ] ("The legislative power is vested in the General Assembly, so called because all the people are present there in the persons of their representatives."). The structure of the bicameral legislative branch itself diffuses its power, see McCrory , 368 N.C. at 653, 781 S.E.2d at 261, and the people themselves limit legislative power by express constitutional prohibitions, see Baker , 330 N.C. at 338-39, 410 S.E.2d at 891-92.
Accountable to the people, N.C. Const. art. II, §§ 3, 5, through the most frequent elections, id. art. II, §§ 2, 4, "[t]he legislative branch of government is without question 'the policy-making agency of our government....' The General Assembly is the 'policy-making agency' because it **430 is a far more appropriate forum than the courts for implementing policy-based changes to our laws," Rhyne v. K-Mart Corp. , 358 N.C. 160, 169, 594 S.E.2d 1, 8 (2004) (quoting McMichael v. Proctor, 243 N.C. 479, 483, 91 S.E.2d 231, 234 (1956) ). See also McCrory , 368 N.C. at 653, 781 S.E.2d at 261 ("The diversity within the [legislative] branch ... ensures healthy review and significant debate of each proposed statute, the enactment of which frequently reaches final form through compromise.").
Article III vests primary executive power with the Governor. N.C. Const. art. III, § 1. Though each of our state constitutions has placed executive power in the Governor generally, id. art. III, § 1 ; N.C. Const. of 1868, art. III, §§ 1, 4 ; N.C. Const. of 1776, § XIX, the constitutional powers of the executive have always been divided among various officials, N.C. Const. art. III, §§ 7 (1)-(2), 8, with the Governor acting as chief executive, id. art. III, §§ 1, 5, within a multimember executive branch. See McCrory , 368 N.C. at 655-57, 781 S.E.2d at 262-63.
Unlike the General Assembly, the Governor historically has only those powers expressly granted by the constitution. E.g. , N.C. Const. art. III, § 5 (outlining the "Duties of Governor"); N.C. Const. of 1868, art. III, § 6 ("to grant reprieves, commutations and pardons"); id. , art. III, § 9 ("to convene the General Assembly in extra session"); N.C. Const. of 1776, § XIX (including the "Power to draw for and apply such Sums of Money as shall be voted by the General Assembly" and to exercise clemency, "the Power of granting Pardons and Reprieves"). Among the express constitutional duties of *122 the Governor is to "take care that the laws be faithfully executed." N.C. Const. art. III, § 5 (4). This provision does not create an independent, policymaking power in the Governor; it simply requires the Governor to enforce "the laws" as passed by the General Assembly. See Winslow v. Morton , 118 N.C. 486, 489-90, 24 S.E. 417, 418 (1896) (acknowledging that, when the constitution authorizes the General Assembly to legislate, the Governor, "as the constituted head of the executive department," is charged "with the duty of seeing that the statute is carried into effect"). Nowhere does the text of the constitution grant the Governor the authority to implement personal policy choices.
While Article III generally outlines executive authority, it nonetheless specifies numerous occasions when the legislature shares in the various responsibilities.[2] Only recently have the people, by constitutional **431 amendment, allowed the Governor to participate in lawmaking through the power of gubernatorial veto. See Act of Mar. 8, 1995, ch. 5, secs. 3, 4, 1995 N.C. Sess. Laws 6, 8 (establishing referendum to amend the constitution to provide gubernatorial veto to take effect 1 January 1997). Nonetheless, a three-fifths vote in each legislative chamber can override a veto. N.C. Const. art. II, § 22 (1). As illustrated by the gubernatorial veto provision, the constitutional text indicates the balance struck between the executive and legislative branches, granting the legislature the ultimate lawmaking authority. Only the people, by constitutional amendment, can change that power balance. McCrory , 368 N.C. at 654, 781 S.E.2d at 262.
This Court's decision in Winslow v. Morton illustrates how the aforementioned constitutional powers of the legislative and executive branches apply without conflict. In Winslow this Court reviewed the historic and express gubernatorial role of commander-in-chief of the militia. 118 N.C. at 488, 24 S.E. at 417. In comparing that role to the federal Executive, the Court noted that Congress, under the Federal Constitution, may provide by law for "raising, equipping and maintaining armies and navies" and "may make rules for the government of the land and naval forces." Id. at 489, 24 S.E. at 418 (citation omitted). "When Congress asserts its authority ... within the purveiw [sic] of its powers the President is deprived of the supreme power of military head of the Government" and instead "incurs the obligation as Chief Executive to see that the laws made by the legislative branch of the government are faithfully executed." Id. at 489, 24 S.E. at 418 (citation omitted). In the same way,
the Constitution of North Carolina (Art. XII, sec. 2) having authorized the Legislature "to provide for the organization, arming, equipping and discipline of the militia," where it passes an act in pursuance of this section, it imposes pro tanto a limit upon the incidental authority of the Governor, as commander in chief and charges him, as the constituted head of the executive department ( Article III, section 1 ), with the duty of seeing that the statute is carried into effect.
**432 Id. at 489-90, 24 S.E. at 418 (citing N.C. Const. of 1868, art. III, § 1, and quoting id. , art. XII, § 2).
Synthesizing the executive's constitutional role as commander-in-chief with the legislature's lawmaking power, the Court concluded that the Governor could in his discretion "dismiss officers of the militia when his powers and duties are not defined by any legislative act." Id. at 490, 24 S.E. at 418 ("The power to dismiss being conferred by the constitutional provision and affirmed by statute, it is clear that the Governor may still *123 lawfully exercise it, unless the Legislature, by virtue of its authority to organize and discipline the militia, has either expressly or by implication repealed the statute."). Once the General Assembly limited the Governor's powers and duties by statute, however, he was constitutionally required to execute the laws as enacted. Winslow further illustrates the general principle that the specific and express allocations of authority between the branches as established by the text must be construed harmoniously.
III.
"The legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." N.C. Const. art. I, § 6. The separation-of-powers clause is located within the Declaration of Rights of Article I, an expressive yet nonexhaustive list of protections afforded to citizens against government intrusion, along with "the ideological premises that underlie the structure of government." State Constitution 46. The placement of the clause there suggests that keeping each branch within its described spheres protects the people by limiting overall governmental power. The clause does not establish the various powers but simply states the powers of the branches are "separate and distinct." N.C. Const. art. I, § 6. The constitutional text develops the nature of those powers. State Constitution 46 ("Basic principles, such as popular sovereignty and separation of powers, are first set out in general terms, to be given specific application in later articles.").
Thus, the separation-of-powers clause "is to be considered as a general statement of a broad, albeit fundamental, constitutional principle," State v. Furmage , 250 N.C. 616, 627, 109 S.E.2d 563, 571 (1959), and must be considered with the related, more specific provisions of the constitution that outline the practical workings for governance,[3] see **433 N.C. Const. art. II (providing the framework for legislative power); id. art. III (providing the framework for executive power); id. art. IV (providing the framework for judicial power). "Nowhere was it stated that the three powers or branches had to be equal. In fact, although the balance occasionally shifted, the preponderant power has always rested with the legislature." State Constitution 50.
Given that "a constitution cannot violate itself," Leandro v. State , 346 N.C. 336, 352, 488 S.E.2d 249, 258 (1997), a branch's exercise of its express authority by definition comports with separation of powers. A violation of separation of powers only occurs when one branch of government exercises, or prevents the exercise of, a power reserved for another branch of government. McCrory , 368 N.C. at 660, 781 S.E.2d at 265.[4] Understanding the prescribed powers of each branch, as divided between the branches historically *124 and by the text itself, is the basis for stability, accountability, and cooperation within state government. See State v. Emery , 224 N.C. 581, 584, 31 S.E.2d 858, 861 (1944) ("[Constitutions] should receive a consistent and uniform construction ... even though circumstances may have so changed as to render a different construction desirable.").
IV.
When confronted with an alleged separation-of-powers violation, a court must first determine if the conflict is nonjusticiable under the political question doctrine. Under this doctrine, courts will refuse to **434 resolve a dispute of "purely political character" or when "[judicial] determination would involve an encroachment upon the executive or legislative powers." Political Questions , Black's Law Dictionary (6th ed. 1990). Federal guidance provides that, "as essentially a function of the separation of powers," Baker v. Carr , 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed. 2d 663, 686 (1962), a court should not review questions better suited for the political branches. The same separation-of-powers principles limit this Court's review.
The political question doctrine controls, essentially, when a question becomes "not justiciable ... because of the separation of powers provided by the Constitution." Powell v. McCormack , 395 U.S. 486, 517 [89 S.Ct. 1944, 1961] 23 L.Ed. 2d 491, 514 (1969). "The ... doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch. The Judiciary is particularly ill-suited to make such decisions...." Japan Whaling Ass'n v. American Cetacean Soc'y , 478 U.S. 221, 230 [106 S.Ct. 2860, 2866] 92 L.Ed. 2d 166, 178 (1986). "It is well established that the ... courts will not adjudicate political questions." Powell , 395 U.S. at 518 [89 S.Ct. 1944, 1962] 23 L.Ed. 2d at 515. A question may be held nonjusticiable under this doctrine if it involves "a textually demonstrable constitutional commitment of the issue to a coordinate political department." Baker v. Carr , 369 U.S. 186, 217 [82 S.Ct. 691, 710] 7 L.Ed. 2d 663, 686 (1962).
Bacon v. Lee , 353 N.C. 696, 717, 549 S.E.2d 840, 854 (2001) (ellipses in original).
As explained by the Supreme Court of the United States, under the political question doctrine, a court should refuse to become embroiled in a separation-of-powers dispute if any one of the following is true: (1) there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department;" (2) the matter involves "a lack of judicially discoverable and manageable standards for resolving it;" (3) the matter is impossible to "decid[e] without an initial policy determination of a kind clearly for nonjudicial discretion;" or (4) a court cannot possibly undertake an "independent resolution without expressing lack of the respect due coordinate branches of government." Baker , 369 U.S. at 217, 82 S.Ct. at 710, 7 L.Ed. 2d at 686. The presence of any one of these factors cautions against judicial entanglement. Judicial review **435 of a political question itself violates separation of powers because the Court asserts a power it does not have to prevent the exercise of a specific power held by a political branch.
V.
Against the backdrop of the General Assembly's plenary legislative power,[5] Article III provides the General Assembly specific authority to create and structure administrative entities. The constitution likewise gives the Governor specific guidelines by which he may influence the allocation of administrative functions, powers, and duties. Nonetheless, the text reserves the final authority for the legislative branch:
*125 (10) Administrative reorganization. The General Assembly shall prescribe the functions, powers, and duties of the administrative departments and agencies of the State and may alter them from time to time, but the Governor may make such changes in the allocation of offices and agencies and in the allocation of those functions, powers, and duties as he considers necessary for efficient administration. If those changes affect existing law, they shall be set forth in executive orders, which shall be submitted to the General Assembly not later than the sixtieth calendar day of its session, and shall become effective and shall have the force of law upon adjournment sine die of the session, unless specifically disapproved by resolution of either house of the General Assembly or specifically modified by joint resolution of both houses of the General Assembly.
N.C. Const. art. III, § 5 (10). By the plain language, the General Assembly has the express authority to "prescribe the functions, powers, and duties of the administrative departments and agencies of the State and may alter them from time to time." Id. ; see also McCrory , 368 N.C. at 664, 781 S.E.2d at 268 (noting "the General Assembly's significant express **436 constitutional authority to assign executive duties to the constitutional executive officers and organize executive departments").[6]
Elsewhere in the same Article, the text again acknowledges the General Assembly's authority over administrative agencies:
[A]ll administrative departments, agencies, and offices of the State and their respective functions, powers, and duties shall be allocated by law among and within not more than 25 principal administrative departments so as to group them as far as practicable according to major purposes. Regulatory, quasi-judicial, and temporary agencies may, but need not, be allocated within a principal department.
N.C. Const. art. III, § 11. It is the General Assembly that statutorily assigns the "respective functions, powers, and duties" of "all administrative departments, agencies, and offices." Id. Moreover, the text specifically acknowledges the validity of "[r]egulatory, quasi-judicial, and temporary agencies" independent of any principal department of the executive branch. Id.
By executive order, the Governor may also "make such changes ... as he considers necessary for efficient administration." Id. art. III, § 5(10). When the Governor makes changes, he submits them to the General Assembly, and they become effective "unless specifically disapproved by resolution of either house ... or specifically modified by joint resolution." Id. Much like the gubernatorial veto, the General Assembly retains the prerogative to statutorily override these changes, to reorganize the structure and functions of the executive branch, and to alter the branch's supervisory structure. Id. art. III, §§ 5(10), 11.
The framers of our current constitution understood the text of Article III, Sections 5(10) and 11 as simply incorporating the historic legislative authority to create and reorganize administrative divisions by statute:
The General Assembly will not be deprived of any of its present authority over the structure and organization of state government. It retains the power to make changes **437 on its own initiative, it can disapprove any change initiated by the Governor, and it can alter any reorganization plan which it has allowed to take effect and then finds to be working unsatisfactorily.
N.C. State Constitution Study Comm'n, Report of the North Carolina State Constitution Study Commission 131-32 (1968) [hereinafter Report ].[7] Though the General *126 Assembly may arrange an administrative structure or assign a particular power, function, or duty to an administrative office at present, the constitution provides that the legislature may arrange differently or assign elsewhere in the future. Id. Inherently, these decisions involve political and policy decisions.
As demonstrated here, the text of Article III, Sections 5(10) and 11 specifically assigns to the General Assembly authority over the administrative divisions it legislatively creates,[8] including the power to alter those same administrative divisions, to structure them as bipartisan, and to make them independent by housing them outside of the executive branch. N.C. Const. art. III, §§ 5 (10), 11. The text of Article III, Section 5(10) likewise specifically affords the Governor a role for making changes by executive order, but subjects those changes to legislative approval. Id. art. III, § 5(10).
Significantly, there is nothing in the constitutional text of Article III, Sections 5(10) or 11 which limits the power of the General Assembly **438 to create an independent, bipartisan board. Likewise, there is no constitutional text that grants the Governor the power to assert personal policy preferences, much less the power to override a policy decision of the General Assembly. Neither Section 5(4) of Article III nor any other constitutional provision gives the Governor an authority that in any way conflicts with the General Assembly's assigned power in Sections 5 (10) and 11. Section 5 (4) does not limit the power of the General Assembly in any manner; it simply requires the Governor to execute the laws as enacted by the General Assembly. Section 5 (4) says nothing about the Governor's role in reorganization and clearly is not an "explicit textual limitation" on the General Assembly's power. The constitutional provisions of Article III do not conflict. The General Assembly makes the laws, and the Governor implements them. As conceded by the majority, when "the Governor is seeking to have the judicial branch interfere with an issue committed to the sole discretion of the General Assembly," the matter is nonjusticiable. The trial court correctly observed:
g. The text of the Constitution makes clear that the power to alter the functions and duties of state agencies is reserved to the Legislature through its law-making ability and to the Governor through executive order subject to review by the Legislature.
h. This Court cannot interject itself into the balance struck in the text of a Constitution specifically dealing with the organization and structure of a state agency. The [challenge here] is a political question and therefore a nonjusticiable issue, and this Court lacks authority to review it.
VI.
Moreover, not only does this case present a political question because the constitution textually commits the type of government reorganization here to the General Assembly, see Baker , 369 U.S. at 217, 82 S.Ct. at 710, 7 L.Ed. 2d at 686, this lawsuit likewise requires an "initial policy determination of a kind clearly for nonjudicial discretion," id. at 217, 82 S.Ct. at 710, 7 L.Ed. 2d at 686.
*127 Here the General Assembly enacted Session Law 2017-6, creating the bipartisan board, "an independent regulatory and quasi-judicial agency [that] shall not be placed within any principal administrative department." Act of Apr. 11, 2017, ch. 6, sec. 4(c), 2017-2 N.C. Adv. Legis. Serv. 21, 25 (LexisNexis) (codified at N.C.G.S. § 163A-5(a) (2017) ). In its enactment, the General Assembly found, among other policy reasons,
**439 that bipartisan cooperation with election administration and ethics enforcement lends confidence to citizens in the integrity of their government; and ... it [is] beneficial and conducive to consistency to establish one quasi-judicial and regulatory body with oversight authority for ethics, elections, and lobbying; and ... it [is] imperative to ensure protections of free speech rights and increase public confidence in the decisions to restrict free speech; and ... voices from all major political parties should be heard in decisions relating to First Amendment rights of free speech....
Ch. 6, 2017-2 N.C. Adv. Legis. Serv. at 21. As evident from the stated purpose, the decision to place elections, lobbying, ethics, and campaign finance within a bipartisan, independent agency, at its heart, is a policy one, seeking to insulate these areas from political influence and creating the structure for achieving this end. Such a decision is precisely the type of "initial policy determination" assigned to the legislative branch. See Beaufort Cty. Bd. of Educ. v. Beaufort Cty. Bd. of Comm'rs , 363 N.C. 500, 512, 681 S.E.2d 278, 286 (2009) (Newby, J., concurring) (concluding that political considerations "should be left to a body like the General Assembly, which is in the best position to consider the full range of evidence and balance the competing objectives").
While the Governor attacks the independent and bipartisan nature of the consolidated board, a judicial resolution would require an initial policy determination this Court cannot make[9] and judicially discoverable and manageable standards that do not exist. By inserting itself into this controversy, the Court expresses a "lack of the respect due" the General Assembly's express constitutional lawmaking authority. This case presents a nonjusticiable political question because it satisfies not just one, which would be sufficient, but all four of the cited Baker criteria.
VII.
The majority's novel analysis creates two significant problems in our jurisprudence, forecasting perilous consequences for years to come. The majority's approach eliminates the political question doctrine and inserts the judiciary into every separation-of-powers dispute between **440 the political branches. Most concerning, the Court's decision judicially amends our constitution to grant the Governor a constitutional power to enact personal policy preferences, even elevating those preferences over the duly enacted laws when they conflict. While the majority correctly states the traditional rule for nonjusticiability as outlined in Bacon and Baker , it then crafts an exception to nonjusticiability that completely swallows the rule: Matters are justiciable any time a party seeks to have the Court "ascertain the meaning of an applicable legal principle, such as [a constitutional provision]."
Under the majority's new test, every separation-of-powers dispute is justiciable. Without exception, a party to a constitutional lawsuit asks the Court to "ascertain the meaning of [the] applicable legal principle." Swept up in this broad reach is Bacon , in which this Court held a challenge to a governor's textual clemency power was a nonjusticiable political question. Bacon , 353 N.C. at 716-17, 721-22, 549 S.E.2d at 854, 857. The plaintiff there sought the "meaning" of the applicable legal principle, Article III, Section 5(6). See id. at 701-04, 711, 549 S.E.2d at 844-47, 851 (asking whether a governor, who as Attorney General defended against the plaintiff's appeal, could consider the plaintiff's clemency request under Article III, Section 5(6) ). Under the majority's new test, however, *128 this Court wrongly decided Bacon . Such an approach to separation-of-powers claims unavoidably sounds the death knell of nonjusticiability. Any claim by a governor under Article I, Section 6 and Article III, Section 5(4) against the legislative branch will be justiciable.
The majority vainly searches to support this inventive approach with a Court of Appeals decision. In News & Observer Publishing Co. v. Easley , the News & Observer filed a public records request for clemency records, arguing the Public Records Law was a "regulation[ ] prescribed by law relative to the manner of applying for pardons" as envisioned by Article III, Section 5(6). News & Observer Publ'g Co. v. Easley , 182 N.C. App. 14, 641 S.E.2d 698, 704-05 (2007) (quoting N.C. Const. art. III, § 5 (6)). In essence, the dispute was not a question regarding a constitutional power textually committed to one branch. It involved the straightforward application of a constitutional provision to a statute. The Court of Appeals simply decided the Public Records Law was not a regulation "relative to the manner of applying for pardons." Id. at 23, 641 S.E.2d at 704.
Seeming to question its own analysis, the majority maintains that
even if one does not accept this understanding of the scope of the General Assembly's authority under **441 Article III, Section 5(10), we continue to have the authority to decide this case because the General Assembly's authority pursuant to Article III, Section 5(10) is necessarily constrained by the limits placed upon that authority by other constitutional provisions.
While the majority cites examples of express limitations that applied in other cases, it does not identify any such constitutional provision that expressly "limits" the General Assembly's authority under Article III, Sections 5(10) and 11.
The majority concedes that the constitution in Article III, Sections 5(10) and 11 textually assign to the General Assembly the authority to create the bipartisan board. It further admits that if the constitution assigns a specific power to a branch, a challenge to that power is nonjusticiable. Missing an actual "explicit textual limitation," the majority manufactures one to create a conflict in the text by judicially rewriting Article III, Section 5(4) to say, "The Governor shall take care that the Governor's personal policy preferences be faithfully executed." It thereby judicially creates a constitutional authority of the Governor to enforce personal policy preferences superior to the General Assembly's historic constitutional authority to make the laws. The majority then holds that, beyond a reasonable doubt, the General Assembly violated separation of powers in creating this bipartisan board because the board's structure prevents the Governor from exercising this newly-minted constitutional authority. Under this holding, the Governor no longer must seek to influence policy by participating in the constitutionally specified procedures of executive orders and the veto, both of which the General Assembly can override. The Governor prevails simply by complaining to the judicial branch that any legislation interferes with the implementation of personal policy preferences.
VIII.
Prominent jurists have warned that courts undermine their legitimacy when they take sides in policy questions assigned to the political branches:
The Court's authority-possessed of neither the purse nor the sword-ultimately rests on sustained public confidence in its moral sanction. Such feeling must be nourished by the Court's complete detachment, in fact and in appearance, from political entanglements and by abstention from injecting itself into the clash of political forces in political settlements.
**442 Baker , 369 U.S. at 267, 82 S.Ct. at 737-38, 7 L.Ed. 2d at 714-15 (Frankfurter, J., dissenting). With today's sweeping opinion, the majority effectively eliminates the political question doctrine, embroiling the Court in separation-of-powers disputes for years to come. In reaching this decision, the majority creates a new and superior constitutional power in the Governor to enforce personal policy preferences, elevating those policy preferences over the constitutionally enacted laws. The General Assembly has the express, *129 as well as the plenary, authority to create a bipartisan, independent board as it did here. Because the General Assembly acted within its express constitutional power, plaintiff's challenge presents a nonjusticiable political question. The only separation of powers violation in this case is this Court's encroachment on the express constitutional power of the General Assembly. Accordingly, I dissent.

To the extent that the Governor argues that the structure of the Bipartisan State Board makes it likely to deadlock rather than reach a five-vote consensus, this argument is speculative and therefore not appropriate for consideration on a facial challenge. See Wash. State Grange v. Wash. State Republican Party , 552 U.S. 442, 449-50, 128 S.Ct. 1184, 1190, 170 L.Ed.2d 151 (2008) ("In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases."); accord Beaufort Cty. Bd. of Educ. v. Beaufort Cty. Bd. of Comm'rs , 363 N.C. 500, 502, 681 S.E.2d 278, 280 (2009).

The majority also argues that, by selecting the most recent Executive Director of the prior State Board of Elections to be an interim Executive Director of the Bipartisan State Board until May 2019, Session Law 2017-6 "limits the ability of persons who share the Governor's policy preferences to supervise the day-to-day activities of the Bipartisan State Board." But the Executive Director does not supervise the Bipartisan State Board; in fact, the opposite is true. See Act of Apr. 11, 2017, ch. 6, sec. 4(c), 2017-2 N.C. Adv. Legis. Serv. 21, 26 (LexisNexis) (codified at N.C.G.S. § 163A-6(c) (2017) ) (noting that the Executive Director is responsible for "staffing, administration, and execution of the [Bipartisan] State Board's decisions and orders ," and also "perform[s] such other responsibilities as may be assigned by the [Bipartisan] State Board " (emphases added)). The majority seems to recognize this very fact when it concedes that the "Executive Director's activities ... appear to be primarily administrative in nature."

Preserving confidence in the political neutrality and operational independence in the administration of elections is essential. See Purcell v. Gonzalez , 549 U.S. 1, 4, 127 S.Ct. 5, 7, 166 L.Ed.2d 1 (2006) (per curiam) ("Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy."); cf. Christopher S. Elmendorf, Election Commissions and Electoral Reform: An Overview , 5 Election L.J. 425, 425 (2006) (describing the recent interest in creating "politically insulated bodies to administer elections" to avoid partisan favoritism during those elections); Richard L. Hasen, Beyond the Margin of Litigation: Reforming U.S. Election Administration to Avoid Electoral Meltdown , 62 Wash. & Lee L. Rev. 937, 978-89 (2005) (describing recent electoral controversies in the United States and advocating for nonpartisan election administration). The "specific factual ... context" of McCrory -which involved complex areas of state environmental regulation-called for a substantial degree of executive oversight and policy discretion. McCrory , 368 N.C. at 646-47, 781 S.E.2d at 257. But the specific factual context of this case-which involves administration of election and ethics laws-calls for neutrality and independence.

As the three-judge panel warned, giving the Governor the degree of control that he seeks will prevent the board from functioning like the former State Board of Elections did-as "an independent regulatory and quasi-judicial agency."

I share Justice Newby's concerns about the breadth of the majority opinion and its implications for judicial encroachment on the role of the General Assembly under "our tripartite system of government." Bacon , 353 N.C. at 712, 549 S.E.2d at 851. I see these concerns as properly addressed in the context of analyzing the merits of the case.

The majority correctly notes that in McCrory the General Assembly did not argue that the Governor's challenge constituted a nonjusticiable political question. But see McCrory , 368 N.C. at 661, 781 S.E.2d at 266 (analogizing clemency review as "an explicit constitutional power" of the Governor, thus presenting "a nonjusticiable, political question," with the General Assembly's designated, "constitutional power to assign itself the authority to fill statutory positions" (citing Bacon , 353 N.C. at 716-17, 549 S.E.2d at 854 )).

Before the state constitution incorporated the specific text of Article III, section 5(10), the North Carolina State Constitution Study Commission reviewed our constitution, drafted and proposed amendments to our current constitution, and transmitted a special report to the Governor and General Assembly. See Report at i-ii.

Relevant here, the constitution specifically recognizes that the General Assembly's policymaking authority includes passing laws related to and regulating elections. See N.C. Const. art. VI, § 2 (2) ("The General Assembly may reduce the time of residence for persons voting in presidential elections."); id. art. VI, § 2(3) ("No person adjudged guilty of a felony against this State or the United States ... shall be permitted to vote unless that person shall be first restored to the rights of citizenship in the manner prescribed by law."); id. art. VI, § 3 ("Every person offering to vote shall be at the time legally registered as a voter as herein prescribed and in the manner provided by law. The General Assembly shall enact general laws governing the registration of voters."); id. art. VI, § 5 ("A contested election for any office established by Article III of this Constitution shall be determined by joint ballot of both houses of the General Assembly in the manner prescribed by law."); id. art. VI, § 8 (recognizing the General Assembly's right to prescribe laws restoring rights of citizenship); id. art. VI, § 9 ("No person shall hold concurrently any two or more appointive offices or places of trust or profit, or any combination of elective and appointive offices or places of trust or profit, except as the General Assembly shall provide by general law."). The constitution recognizes no similar role for the Governor.

As the majority concedes, "the General Assembly has the authority to provide the [board] with a reasonable degree of independence from short-term political interference and to foster the making of independent, non-partisan decisions. All of these determinations are policy-related decisions committed to the General Assembly rather than to this Court."